James H. Power
Marie E. Larsen
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: 212-513-3200
Telefax: 212-385-9010
Email: james.power@hklaw.com
         marie.larsen@hklaw.com

*Attorneys for Plaintiff*
*Birch Shipping Ltd*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————

BIRCH SHIPPING LTD.,

                              Plaintiff,

        - against -

O.W. BUNKER CHINA LTD. (HK), O.W.
BUNKER USA INC., O.W. BUNKER NORTH
AMERICA INC.. O.W. BUNKER HOLDING
NORTH AMERICA INC., O.W. BUNKER &
TRADING A/S, CHEMOIL LATIN AMERICA
INC., ING BANK N.V.

                              Defendants.

———————————————————

14 Civ. _____ 9282 ( )

**COMPLAINT
FOR INTERPLEADER**

        Plaintiff Birch Shipping Ltd. ("Birch Shipping"), by and through its attorneys Holland &

Knight LLP, as and for its Complaint for Interpleader pursuant to 28 U.S.C. §§ 1335(a) and 2361

alleges, upon information and belief, as follows:

## THE PARTIES

        1.        Birch Shipping is a foreign corporation organized and existing under the laws of a

foreign jurisdiction, with an office and place of business at 12th Floor, Warwick House, Taikoo

Place, 979 Kings Road, Quarry Bay, Hong Kong, China 999077.

2.     Defendant O.W. Bunker China Ltd. (HK) ("O.W. China") is a corporation or business entity organized and existing pursuant to the laws of Hong Kong, with an office and place of business at Rm. 1710-11, Shui On Centre, 6 Harbour Rd., Wanchai, Hong Kong.

3.     Defendant O.W. Bunker USA Inc. ("OW USA") is a corporation or business entity organized and existing pursuant to the laws of Texas the with its principal place of business at 2603 August Drive, Suite 440, Houston, TX 77057.

4.     Defendant O.W. Bunker North America Inc. ("OW North America") is a corporation or business entity organized and existing pursuant to the laws of Connecticut, with an office and place of business at 281 Tresser Blvd., 2 Stamford Plaza, 15th Floor, Stamford, CT 06901.

5.     Defendant O.W. Bunker Holding North America Inc. ("OW Holding") is a corporation or business entity organized and existing pursuant to the laws of Connecticut, with an office and place of business at 281 Tresser Blvd., 2 Stamford Plaza, 15th Floor, Stamford, CT 06901.

6.     Defendant O.W. Bunker & Trading A/S ("OW Denmark") is a corporation of business entity organized and existing under the laws of a foreign jurisdiction, with an office and place of business at Stigsborgvej 60, DK-9400 Noerresundby, Denmark.

7.     Defendant Chemoil Latin America, Inc. ("Chemoil") is a corporation or business entity organized and existing pursuant to the laws of a foreign jurisdiction, with an office and place of business at P.H. Plaza Canaima, 9th Floor, Samuel Lewis Street, Panama.  Chemoil is a subsidiary of Chemoil Corporation, a company registered to do business in New York.

8.    Defendant ING Bank N.V. ("ING") is a bank organized and existing pursuant to the laws of the Netherlands with an office and place of business located at Amsterdamse Poort, Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 and Fed.R.Civ.P. 9(h),  inasmuch as it involves the interpleader of funds in the possession of Birch Shipping for the payment pursuant to a bunker supply contract for the provision of necessaries (i.e., fuel oil or bunkers) to the vessel M/V BIRCH 6 (the "Vessel").

10.    This Court has original jurisdiction over this interpleader action pursuant to 28 U.S.C. § 1335(a) in that for the bunker payment in question: (a) at least two of the claimants are of diverse citizenship; (b) the dispute between the claimants involves funds in an amount exceeding $500.00, exclusive of interest and costs; and (c) Birch Shipping is the stakeholder of the funds and, concurrently with the filing of this Complaint, will seek to make a deposit in the Court's Registry in the sum of $266,908.81.

11.    This Court has personal jurisdiction over defendant OW China, OW Denmark and Chemoil pursuant to the terms of the applicable bunker supply contracts, wherein both OW China and Chemoil have selected the District Court for the Southern District of New York as the location for dispute resolution.

12.    This Court has personal jurisdiction over defendants OW USA, OW North America, OW Holding pursuant to 28 U.S.C. §2361.

13.    This Court has personal jurisdiction over ING Bank N.V. to the extent it is or may be a third-party beneficiary of the bunker supply contract at issue in this dispute and to the extent

that it is an alleged assignee of the receivables of OW Denmark and/or OW China and/or OW USA and/or OW North America and/or OW Holding.   Additionally, ING transacts business within the jurisdiction of this Court.

14.    Venue is properly laid in this Court pursuant to 28 U.S.C. § 1397.

## NATURE OF ACTION

15.    This is an action for interpleader with respect to the sum of $266,908.81 representing the amount due under an invoice for the supply of bunkers to the vessel M/V BIRCH 6.  With respect to payment of the invoice, OW China, OW USA, OW North America, OW Holding, OW Denmark, Chemoil, ING Bank N.V. or some other third party may have conflicting claims as to ownership of the funds owed by Birch Shipping for the purchase of and receipt of a quantity of bunkers (fuel) in the Port of Balboa, Panama for the vessel M/V BIRCH 6.

## FACTUAL BACKGROUND

16.    Birch Shipping ordered bunkers to be loaded onboard and consumed by the Vessel from OW China.  OW China is apparently a corporate affiliate of OW USA, OW North America and OW Holding.  The bunkers were supplied to the Vessel within the Port of Balboa, Panama.

17.    The bunkers were delivered to the Vessel on October 18, 2014.  A bunker delivery receipt was issued by Chemoil.  A true copy of the bunker delivery receipt is attached hereto as Exhibit 1.

18.     The bunker delivery receipt notes that Chemoil is the supplier of the bunkers, delivered by the bunkering barge, GREAT GATUN.  Bunkers were supplied in accordance with Chemoil's standard terms and conditions.

19.     An invoice was issued to Birch Shipping on October 18, 2014 by OW China for the supply of bunkers to BIRCH 6.  The invoice directs payment of $266,908.81 to OW China. A true copy of the bunker invoice is attached hereto as Exhibit 2.

20.     The standard terms and conditions of all OW Bunker entities for the sale of bunkers includes clause P.5: "Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim aris[ing] in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York."  A true copy of the OW Bunker terms is attached hereto as Exhibit 3.

21.     The Chemoil standard terms and conditions for the sale of bunkers includes clause 14: "Except as otherwise provided herein, each of the Parties irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York…" A true copy of the Chemoil terms is attached hereto as Exhibit 4.

22.     The Chemoil standard terms and conditions for the sale of bunkers also includes clause 15(a): "This Contract shall be governed by and construed in all particulars by the laws of the State of New York (excluding its conflict of law rules which may result in the application of laws of another jurisdiction) applying the principles of maritime law as applied in the federal District Courts of the United States of America.  The maritime laws of the United States shall

apply to any determination of the existence of a maritime lien, regardless of the country in which Seller takes legal action." Exhibit 4.

23.    On or about November 12, 2014, Birch Shipping received a letter from Chemoil, through its New York attorneys, Clyde & Co.  A true copy of the letter is attached as Exhibit 5. In the letter Chemoil states "Chemoil demands that you make payment in accordance with the terms set forth in the attached invoice.  Chemoil reserves the right to enforce its maritime lien against the vessel for this amount unless payment in full is received before November 17, 2014. Please promptly confirm to us that full payment will be made by November 17, 2014.  Failure to do so may result in the arrest of the vessel to enforce Chemoil's maritime lien."  The letter also attached copies of the bunker delivery receipt and the Chemoil bunker invoice to OW USA in the amount of $257,163.87.  True copies are attached hereto as Exhibit 6.

24.    On or about November 13, 2014, OW USA, OW North America and OW Holding all filed voluntary petitions pursuant to Chapter 11 in the United States Bankruptcy Court for the District of Connecticut as Case Nos. 14-51720, 14-51721 and 14-51722.

25.    Pursuant to an Omnibus Security Agreement dated December 19, 2013 between O.W. Bunker & Trading A/S and its subsidiaries (believed to include OW China, OW USA, OW North America and OW Holding), and ING as Security Agent, the O.W. entities have allegedly assigned certain rights in respect of their supply contracts as security to ING.

26.    Due to the bankruptcy filings of the Defendants OW USA, OW North America and OW Holding, it is possible that Chemoil, ING or any one of the numerous OW-related subsidiaries or parent corporations will seek to collect amounts allegedly owed to them arising from or related to the supply of bunkers to the Vessel.

27.     On November 21, 2014 the trustees of O.W. Demarks sent a letter to numerous customers of the O.W. Bunker subsidiaries demanding payment of outstanding balances.  A true copy of the letter is attached as Exhibit 7.

### POSSIBLE ARREST OF VESSEL AND NECESSITY OF INTERPLEADER

28.     Under United States maritime law, it is undisputed that the contract supplier (such as OW China) of necessaries, including fuel, to a vessel obtains a maritime lien against that vessel.  Additionally, under certain circumstances, a physical supplier of the fuel (such as Chemoil) may also assert a maritime lien on that vessel.

29.     Moreover, other parties, such as ING, may be expected to assert a right to the bunker payment.

30.     The Vessel is due to call at various ports in the United States and could face arrest pursuant to Supplemental Admiralty Rule C by any of the defendants claiming to assert a maritime lien,[1] which would cause harm to Plaintiff, delay the Vessel, affect innocent third parties with interests in the Vessel's cargo and generally inhibit maritime commerce.

31.     Birch Shipping presently has control over the funds owed for the supply of bunkers to the Vessel.  Birch Shipping disclaims any interest in the amount owed for the supply of bunkers to the Vessel.

32.     Birch Shipping cannot ascertain whether the amount owed should be paid to OW China, OW USA, OW North America, OW Holding, OW Denmark, Chemoil or ING in order to extinguish all maritime liens and/or other claims against Birch Shipping and the Vessel and to prevent its arrest in this District or elsewhere.

---

[1] Birch Shipping makes no assertion nor takes a position as to the validity of any of the potentially asserted maritime liens or other claims by any of the Defendants.  This issue is a matter to be decided by the District Court.

33.    The competing claims of the Defendants or other third parties may expose Birch Shipping to multiple liability in connection with the payment of the bunker invoice in order to extinguish competing maritime lien claims and/or other *in personam* or non-maritime claims.

34.    Birch Shipping is entitled to deposit with the Court the sum of $266,908.81, representing the amount due pursuant to the bunker invoice, and require that OW China, OW USA, OW North America, OW Holding, OW Denmark, Chemoil, ING and any other claimant interplead among themselves to establish their respective rights to the funds.

35.    After depositing the sum of $266,908.81 with the Court, Birch Shipping is entitled to be discharged from further liability with respect to the funds. The Vessel is similarly entitled to be discharged from any maritime lien against it arising from the supply of bunkers as described herein and as reflected in Exhibits 1-2, and 5-6.

WHEREFORE, Plaintiff Birch Shipping Ltd. respectfully requests that this Court:

(i)    determine which of the defendants is entitled to the bunker invoice funds, or, in the alternative, the share of each defendant, if any;

(ii)    enjoin O.W. Bunker China Ltd. (HK), O.W. Bunker USA Inc., O.W. Bunker North America Inc., O.W. Bunker Holding North America Inc., O.W. Bunker & Trading A/S, Chemoil Latin America Inc. and ING Bank, N.V. from commencing any action against Birch Shipping Ltd., including but not limited to the arrest of the Vessel M/V BIRCH 6 in any port, pursuant to Supplemental Admiralty Rule C or Rule B based on the assertion of any *in rem* claim for the provisions of the bunkers;

(iii)    discharge Birch Shipping from any liability on any claim that has been made or may in the future be made to the $266,908.81 upon Birch Shipping's deposit of the funds into this Court's registry;

(iv)    discharge the vessel M/V BIRCH 6 from any liability on any claim that has been made or may in the future be made to the $266,908.81 upon Birch Shipping's deposit of the funds into this Court's registry;

(v)    award Birch Shipping its costs and attorneys' fees in this action; and

(vi)    award Birch Shipping such other and further relief which this Court may deem just and proper.

Dated:  New York, New York
       November 21, 2014

                           HOLLAND & KNIGHT LLP

                           By: _____

                           James H. Power
                           Marie E. Larsen
                           31 West 52nd Street
                           New York, New York 10019
                           Telephone:  212-513-3200
                           Telefax: 212-385-9010
                           Email:  james.power@hklaw.com
                                     marie.larsen@hklaw.com

                           *Attorneys for Plaintiff Birch Shipping Ltd.*

#34098607_v1

# EXHIBIT 1



2/2

# MARINE FUEL DELIVERY RECEIPT

CHEMOIL LATIN AMERICA INC •P.H. Plaza Conaima, 19 th Floor •Samuel Lewis Street •Panama
Phone (507) 265-5070 • Fax (507) 265 5088 • E-mail gmops@chemoil.com

## CHEMOIL

Nº 8470

| VESSEL NAME | IMO # | BARGE NAME | DATE |
|---|---|---|---|
| BIRCH 6 | 9138628 | GREAT GATUN | 18/OCT/14 |

| LOADING TERMINAL LOCATION | DELIVERY LOCATION |
|---|---|
| DECAL | BALBOA ANCHORAGE |

| PRODUCT | GROSS BBLS | NET BBLS | WEIGHT M TONS |
|---|---|---|---|
| HSFO | 2579.85 | 2543.70 | 400.17 |
| LSDMA | 350.52 | 347.61 | 47.06 |

## PROPERTIES

| GRADE | VISCOSITY CST AT 50°C | API AT 60°F | DENSITY AT 15°C | TEMP °F | FLASH F | POUR °F | WATER % VOL | SULFUR % M/M |
|---|---|---|---|---|---|---|---|---|
| HSFO | 195.4 | 11.2 | 0.9910 | 94 | 64C | -15C | 0.15 | 1.55 |
| LSDMA | 2.59 | 35.0 | 0.8494 | 78 | 150 | | -0- | 0.087 |

| | DATE | TIME |
|---|---|---|
| BARGE ALONGSIDE | 18/10 | 1040 |
| HOSE CONNECTED | 18/10 | 1100 |
| STARTED PUMPING | 18/10 | 1230 |
| FINISHED PUMPING | 18/10 | 1400 |
| HOSE DISCONNECTED | 18/10 | 1450 |
| BARGE AWAY | 18/10 | 1740 |

The fuel oil supplied is in conformity with regulation 14 (1) or 4 (a) and regulation 18 (1) of Marpol 73/78 Annex VI

The marine fuel described herein is delivered in accordance with Chemoil Standard Terms and Conditions of Sale (a copy of which has been provided to buyer prior to delivery) and on credit of the vessel. Any disclaimers as to the creation of a maritime lien in the amount of the purchase price and delivery charges and/or restrictions as to the authority of the ship's officer signing this Receipt to bind the vessel and her owner to the above are null and void unless an authorized representative of Chemoil shall have otherwise agreed in writing at the time Buyer initially orders the marine fuel. Failing such agreement delivery shall under no circumstances constitute a waiver by Chemoil of the above

REMARKS

```
                    LSDMA
                 HC: 1440
                 SP: 1500
                 FP: 1645
                 HD: 1720
```

| | | HSFO | LSDMA |
|---|---|---|---|
| BARGE SAMPLE (SUPPLIER) | SEAL # | 261222/21. | 261226/25. |
| BARGE SAMPLE (VESSEL) | SEAL # | 261214. | 261228. |
| MARPOL ANNEX VI SAMPLE | SEAL # | 261223. | 261227. |
| OTHER SAMPLE | SEAL # | | |

SAMPLES GIVEN TO CUSTOMER      ☒ YES      ☐ REFUSED

DECLARATION OF MASTER/CHIEF ENGINEER
I declare that the information given above is true and correct to the best of my knowledge and belief that I have knowledge of the facts set forth herein that the articles described in the notice of lading were received in the quantities were laden on the vessel named above for use on said vessel as supplies except as noted below

GAUGES WITNESSED BY SHIP'S REPRESENTATIVE
☒ BEFORE   ☐ AFTER   ☐ DECLINED

Received for use as bunkers together with representing only quantities show above. Seal quantities above are set off/only in case of error

DELIVERING COMPANY      I.S.S.

M.V. BIRCH 6

BY     CAP. LUIS SAGASTEGUI

MASTER/CHIEF ENGINEER

DATE    18/OCT/14 BIP Great Gatun

DATE                        Chief Engineer

White (office) Yellow (office) Pink (office) Green (ship)

# **EXHIBIT 2**

*P1. EC001184*
*J..00007766*



```
┌─────────────┐
│  O W N E R S │
└─────────────┘
```

*scan ½*

M/V  BIRCH 6
AND/OR OWNERS/CHARTERERS

| | |
|---|---|
| Wallem Commercial Services Ltd. | |
| 12/F  Warwick House East | **DATE OF INVOICE :** 18. October 2014 |
| Taikoo Place, 979 King's Road | **INVOICE NO** : 131-141427 |
| Quarry Bay, Hong Kong | |
| Hong Kong | ORDER NO. : 131-22513 |
| | DATE OF SUPPLY : 18. October 2014 |

PORT: BALBOA                    **DUE DATE** : 16. November 2014
YOUR REFERENCE

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 400.170 MT | Fueloil 380-CST 3,5% | 530.00 MT | 212,090.10 |
| 47 060 MT | GASOIL 1% | 950.00 MT | 44,707.00 |
| 1 000 LPS | Barging | 7,500.00 LPS | 7,500.00 |
| 1 000 LPS | Pipelinefee | 1,465.19 LPS | 1,465.19 |
| 1 000 LPS | Pollution fee | 146.52 LPS | 146.52 |
| 1.000 LPS | Weekend charge | 250.00 LPS | 250.00 |
| 1.000 LPS | Surcharge | 750.00 LPS | 750 00 |

```
┌──────────────────────────────┐
│ SUPPLIER CODE: 00/570        │
├──────────────┬───────────────┤
│ VSL ACE3     │ CCY: USD      │
├──────────────┼───────────────┤
│ CHECKED      │ APPROVED      │
│  3-11-2014   │               │
└──────────────┴───────────────┘
```
*296001*

| | | | |
|---|---|---|---|
| Your VAT No | | VAT Amount    USD | 0 00 |
| Our VAT No. | | Total    USD | 266,908.81 |

The prices are excl. all taxes and/or other fees.

**TERMS OF PAYMENT** 30 days from date of supply With value date not later than DUE DATE or previous working day
when it is a holiday  In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

| | | | |
|---|---|---|---|
| **BANK:** | ING Bank N.V. | | **O.W. BUNKER CHINA LTD. (HK)** |
| | | | Rm  1710 -11  Shui On Centre |
| **ACCOUNT:** | IBAN: NL18 INGB 0020 1179 81 | | 6 Harbour Rd , Wanchai |
| | IBAN: NL41 INGB 0651 3630 12 | USD and all other currencies | Hong Kong |
| | | EUR | |
| | SWIFT: INGBNL2A | | Phone    (852) 37580588 |
| | | | Fax    (852) 2866 9590 |

Email  owbchina@owbunker.com hk

Per telegraphic transfer directly to our account without deduction
of bank charges which are for buyers account

# O.W. Bunker China Ltd. (Hong Kong)



GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

BEFORE BUNKERING

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified

Make sure to witness and verify initial measurements and ullaging onboard the barge before ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks). Compare measurements and verify the quantities as per barge ullage tables. When in full agreement please sign the ullage/sounding report for Before Supply figures. If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt)

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures

DURING BUNKERING

Always place a watchman to witness safe operation including also proper and correct sampling. The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling. Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labelling and sealing of ALL samples. Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes. All seal numbers to be inserted into the Bunker Delivery Receipt (BDR). The MARPOL sample must be one of these samples drawn under witnessing

The watchman must pay special attention to the bunker hose and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties. If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply. Pay special attention hereto and take all necessary precautions to observe, which includes
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge
- Agree with the barge when and if they are going to make stripping of their tanks
- Check and note the draft fore, mid and aft on the barge before and after supply to compare
- If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master

AFTER COMPLETION

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank. Make sure also on completion to verify contents of ALL tanks, including those being idle

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor. If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply

QUANTITY COMPLAINTS

Receiving Vessel to inform discrepancies in writing latest upon completion of taking the bunkers

## O.W. Bunker China Ltd. (Hong Kong)

 **Bunker**

TERMS AND CONDITIONS.
----------------------------------------------

SAMPLES:

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is
requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified
quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any
dispute regarding quality to be settled by testing these retained samples by an independent laboratory at
port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and
Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall
be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to  as 'Seller'.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the
terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

GUIDELINES FOR RECEIVING BUNKERS:

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for
Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested
Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid
quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

OTHERWISE:

Any errors or omissions in above Confirmation should be reported immediately.


PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR
UNDERSTANDING.

# **EXHIBIT 3**

# OW BUNKER GROUP

## Terms and Conditions of sale for Marine Bunkers
## Edition 2013

## A.    GENERAL INTRODUCTION

A.1    This is a statement of the terms and conditions according to which the International O.W. Bunker Group (hereinafter called "OWB") will sell marine bunkers.

A.2    These conditions apply to all offers, quotations, orders, agreements, services and all subsequent contracts of whatever nature, except where otherwise is expressly agreed in writing by OWB.

A.3    General trading conditions of another party will not apply, unless expressly accepted in writing by OWB.

A.4    In the case that, for whatever reason, one or more of the (sub)clauses of these general conditions are invalid, the other (sub)clauses hereof shall remain valid and be binding upon the parties.


## B.    DEFINITIONS

B.1    Throughout this document the following definitions shall apply:

| | |
|---|---|
| "Seller" | means OWB; any office, branch office, affiliate or associate of the OWB Group; being the legal entity within the OWB Group, whose name is included in the Order Confirmation, sent to the Buyer. |
| "Buyer" | means the vessel supplied and jointly and severally her Master, Owners, Managers/Operators, Disponent Owners, Time Charterers, Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made; |
| "Bunkers" | means the commercial grades of bunker oils as generally offered to the Seller's customers for similar use at the time and place of delivery and/or services connected thereto; |
| "Owner" | means the registered Owner, Manager or Bareboat Charterer of the vessel; |
| "Vessel" | means the Buyer's Vessel, Ship, Barge or Off-Shore Unit that receives the supply/bunkers; either as end-user or as transfer unit to a third party; |
| "Nomination" | means the written request/requirement by the Buyer to the Seller, for the supply of the Bunkers; |
| "Order Confirmation" | means the written confirmation as issued by the Seller and forwarded to the Buyer to conclude the conclusion of the negotiated sale/purchase of the Bunkers. In case of conflict between the Nomination and the Order Confirmation, unless the Seller otherwise agrees in writing, the wording and content of the Order Confirmation is deemed contain the prevailing terms of the Agreement; |
| "Agreement" | means the concluded terms for the sale/purchase of the Bunkers; |
| "Supplier" | means any party instructed by or on behalf of the Seller to supply or deliver the Bunkers; |
| "GTC" | means these General Terms and Conditions which shall govern the contractual regulations between the Seller and the Buyer |
| "BDR" | means the Bunker Delivery Receipt, being the document(s) which is/are signed by the Buyer's representative(s) at the place of the supply of the Bunkers to the Vessel, evidencing the quality and quantity of the Bunkers supplied to and received by the Vessel. |


## C.    OFFERS, QUOTATIONS AND PRICES

C.1    An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order Confirmation to the Buyer. Each Order Confirmation shall incorporate these GTC by reference so that the GTC are considered a part of the Confirmation.

C.2    Agreements entered into via brokers, or any other authorised representative on behalf of the Seller, shall only bind the Seller upon the Sellers' broker or other authorised representative sending the Order Confirmation to the Buyer or the Buyer's broker as the case may be.

C.3    The Seller's offer is based on the applicable taxes, duties, costs, charges and price level of components for Bunkers existing at the time of the conclusion of the Agreement. Any later or additional tax, assessment, duty-or other charge of whatever nature and however named, or any increase of components for Bunkers or any additional costs borne by the Seller whatsoever caused by any change in the Seller's contemplated source of supply or otherwise, coming into existence after the Agreement has been concluded, shall be added to the agreed purchase price, provided that the Seller shall give

the Buyer prior notice of this effect within a reasonable (under the prevailing circumstances) time after the Seller becoming aware of the relevant circumstances

C 4    All prices and/or tariffs are exclusive VAT unless specifically stated otherwise Any VAT or other charge and/or tax applicable and whenever imposed shall be promptly paid by the Buyer and unless otherwise agreed in writing all supplies are quoted and invoiced based on quantity calculated quantity in metric tons in vacuum

C 5    If the party requesting Bunkers is not the Owner of the Vessel the Seller shall have the right (but will not be obliged) to insist as a precondition of sale that a payment guarantee is provided by the Owner The Seller shall have the right (but will not be obliged) to cancel any agreement with the Buyer at any time, if such payment guarantee is not received upon request thereof from the Seller to the Owner The Seller's decision to forego obtaining a payment guarantee under this Clause C 5 shall have no effect on Seller's right to a lien on the Vessel for any Bunkers supplied under this Agreement

C 6    The Buyer warrants that it is authorized as agent to order Bunkers for the Vessel and that the Seller has a lien on the Vessel for any Bunkers supplied under this Agreement If the party requesting Bunkers is not the Owner of the Vessel Buyer assumes the sole responsibility for communicating the terms and conditions of this Agreement to the Owner of the Vessel prior to the date of delivery

C 7    If at any time before the delivery the financial standing of the Buyer appears to the Seller (in its absolute discretion) to have become impaired or unsatisfactory the Seller may require cash payment or security to be provided by the Buyer prior to delivery, failing which the Seller may cancel the delivery without any liability on the part of the latter or its subcontractors

## D.    SPECIFICATIONS (QUALITY – QUANTITY)

D 1    The Buyer assumes the sole responsibility for the choice of nominating the quantity and quality of Bunkers and determine (if applicable) potential compatibility with any Bunkers already on board the Vessel The Buyer also assumes sole responsibility for the selection and fitness of its choice of Bunkers for any particular use or purpose and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Bunkers for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any C/P (Charterparty) term or otherwise This includes but is not limited to the quality sulphur content and any other specific characteristics of the Bunkers whatsoever Any and all warranties regarding the satisfactory quality merchantability fitness for purpose description or otherwise are hereby excluded and disclaimed
Where specifications designate a maximum value no minimum value is guaranteed unless expressly stated in the Order Confirmation and conversely where minimum values are provided in a specification no maximum values are guaranteed unless expressly stated in the Order Confirmation

D 2    The quality and quantity shall be as agreed between the Seller and the Buyer and shall correspond to the Seller's Order Confirmation Unless otherwise agreed in writing the Bunkers are delivered and sold based on metric tons in vacuum

D 3    Where standard specifications are being given or referred to tolerances in accordance with ISO 4259 in respect of Reproducibility/Repeatability in quality are to be accepted without compensation or other consequences whatsoever

D 4    In respect of the quantity agreed upon the Seller shall be at liberty to provide and the Buyer shall accept a variation of 5% from the agreed quantity with no other consequence than a similar variation to the corresponding invoice from the Seller

D 5    Information regarding the typical characteristics of the Bunkers at any delivery location shall only be indicative of the Bunkers that have been made available at that location and shall not form a part of the specification of the Bunkers to be delivered All grades of produce may contain petroleum industry allowed bio derived components

## E.    MEASUREMENTS – NON CLAUSING OF THE BDR(S)

E 1    The quantities of bunkers shall be determined only from the official gauge or meter of the bunkering barge, tank truck or of the shore tank in case of delivery ex wharf

E 2    The Buyer's representative shall together with the Seller s representative measure and verify the quantities of Bunkers delivered from the tank(s) from which the delivery is made When supplied by bunkering barge/tanker the particular barge/tanker will present its tank calibration and ullage sounding records which are agreed to be the sole valid and binding document(s) to determine the quantity or quantities supplied Quantities calculated from the Receiving Vessel's soundings shall not be considered

E 3 Should the Buyer's representative fail or decline to verify the quantities the measurements of quantities made by the Seller or the Supplier shall be final conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance

E 4 The Buyer expressly undertakes not to make any endorsement complaint/ comment (including but without limitation any ' No lien ' clausing) on the BDR when presented for signature by the Buyer's representative(s) any such insertion shall be invalid and of no effect whatsoever

E 5 In the event of complaint/comment on the quantity of Bunkers delivered the Buyer or the Master of the Vessel shall give to the Seller/Supplier a letter of protest separately followed by a complaint in detail to the Seller setting out the exact quantity(ies) claimed shortsupplied and with full supporting vouchers in writing within 7 (seven) days thereof failing which any such claim by the Buyer shall be extinguished as non existent and the Buyer shall be deemed to have expressly waived any such claim against the Seller/Supplier the relevant claim being time barred and the Seller/Supplier's weight and measurements shall be conclusive evidence of the quantity of Bunkers delivered

## F. SAMPLING

F 1 The Supplier shall arrange for four (4) representative samples of each grade of Bunkers to be drawn throughout the entire bunkering operation The Buyer's representative has the responsibility to witness that such samples are drawn correctly and shall confirm his witnessing thereof and also confirm the proper and correct sealing by signing the labels of the sample bottles

F 2 In case that dripsampling is not available onboard the barge tanktruck or shore tank samples shall be taken as a composite of each tank from which supplies are made onboard the barge (respectively at the shore tank or tanktruck) divided with 1/3 from each the top mid and bottom of the tanks

F 3 The samples shall be securely sealed and provided with labels showing the Vessel s name identity of delivery facility product name delivery date and place and seal number authenticated with the Vessel s stamp and signed by the Seller s representative and the Master of the Vessel or his representative The seal numbers shall be inserted into the BDR/Bunker Delivery Receipts and by signing the BDR both parties agrees to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this Chapter F

F 4 Two (2) samples shall be retained by the Seller for ninety (90) days after delivery of the Bunkers or if requested by the Buyer in writing for as long as the Buyer reasonably required The other two (2) samples shall be retained by the receiving Vessel one of which being dedicated as the MARPOL sample

F 5 In the event of a dispute in regard to the quality of the Bunkers delivered the samples drawn pursuant to this Chapter F shall be conclusive and final evidence of the quality of the Bunkers delivered One and only one of the samples retained by the Sellers shall be forwarded to an independent laboratory to perform a set of tests the result of which is to be made available to both parties Those test results shall be final and binding upon both Buyer and Seller as to the parameters tested The parties are to use best endeavours to agree the independent laboratory to perform the tests If however no agreement can be reached on the choice of laboratory within 3 days of the Buyer being advised of the Seller opting to have the sample tested the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted and those test result will be final and binding upon Buyer and Seller as set out above

F 6 The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present or fails to be present at the appropriate time and place and both parties shall have the right to appoint independent person(s) or surveyor(s) to witness the seal breaking

F 7 No samples subsequently taken shall be allowed as (additional) evidence If any of the seals have been removed or tampered with by an unauthorised person such sample(s) shall be deemed to have no value as evidence

F 8 Any eventual samples drawn by Buyer's personnel either during bunkering or at any later date after bunkering shall not be valid as indicator of the quality supplied The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other fuels

**G**          **DELIVERY**

G 1          The time of delivery as given by the Seller has been given as an approximate time unless it has been otherwise specifically agreed in writing between the parties

G 2          The time of delivery will only be binding upon the Seller when all information necessary for the Seller to comply with its obligations hereunder have been properly delivered to the Seller in reasonable time before the delivery In the event the Nomination addresses a spread of dates for delivery the Seller has the sole discretion to commence the delivery within any time day/night/sshinc of these dates always subject to the circumstances set out below in Clause G 3

G 3          The Vessel shall under all circumstances be bunkered as promptly as the prevailing circumstances permit having regard to congestion affecting the delivery facilities of Seller its Suppliers or Agents and to prior commitments of barges or other delivery means The Seller and/or the Supplier shall not be liable for any consequences or any time lost due to the Vessel having to wait for berth for bunkering or for completion of bunkering and unless otherwise agreed in writing the Seller shall not be obligated to deliver prior to the nominated date or spread of dates The Seller is not responsible for delays caused by local customs pilots port or other authorities

G 4          In any case the Buyer unless otherwise agreed in writing must give not less than 72 (seventy two) hours approximate notice of readiness of the Vessel for delivery which is to be followed by 48 (forty eight) hours and 24 (twenty four) hours such notices where the last notice must also specify the exact place of delivery All these notices must be given to the Sellers and the Seller's representatives/agents in writing

G 5          The Seller shall be entitled to deliver the Bunkers by separate part deliveries in which case each part delivery shall be construed as a separate delivery

G 6          The Seller shall not be required to deliver any Bunkers if any customs and/or other government permit required for such purpose has not been obtained in due time before the delivery

G 7          If the Seller at any time for any reason believes that there may be a shortage of supply at any place and that as a result thereof it may be unable to meet the demands of all its customers the Seller may allocate its available and anticipated quantity/ies of Bunkers among its customers in such a manner as it may determine appropriate in its sole discretion

G 8          The Vessel shall be accessible at all times to Seller and Supplier and shall be bunkered as promptly as the circumstances permit The Seller and/or the Supplier shall not be liable for any demurrage paid or incurred by the Buyer or for any loss damage or delay of the Vessel (consequential and/or liquidating damages included) of any nature whatsoever due to congestion at the loading terminal prior commitments of available barges or tank trucks or any other reason

G 9          The Buyer shall ensure that the Vessel provides a free safe and always afloat and accessible side for the delivery of bunkers and that all necessary assistance as required by the Seller or the Seller s representative is rendered in connection with the delivery If in the Supplier s opinion clear and safe berth is unavailable delivery might be delayed or in Seller s option cancelled and all costs related to above will be on account of the Buyer

G 10          The Vessel shall moor unmoor hoist and lower bunkering hose(s) from the barge(s) whenever required by the Seller Seller s representative or Supplier free of expenses and in any way as may be requested to assist the barge equipment to a smooth supply The Buyer shall make and be responsible for all connections and disconnections between the delivery hose(s) and the Vessel s bunker intake manifold/pipe and ensure that the hose(s) are properly secured to the Vessel's manifold prior to commencement of delivery
During bunkering the Vessel s scuppers must be safely blocked which blocking must be made by the Vessel s own crew Furthermore the Vessel must ensure that all pipes and manifolds and receiving tanks are properly checked and ready to receive the bunkers including but not limited to ensuring proper opening/closing of relevant valves without any risk for spillages etc during the bunkering
Local further special requirements for receiving bunkers must be followed strictly by the Vessel whether advised or not by the Seller or the Seller's representative as it is always the Vessel and the Buyer who remains solely responsible for the knowledge and awareness of such eventual additional requirements for safety reasons

G 11          In the event that the Vessel is not able to receive the delivery promptly the Buyer is thereby in default and shall pay damages and/or any reasonable demurrage claim to the barging/supplying facilities and shall indemnify the Seller in each and every respect as a result thereof

G 12          Delivery shall be deemed completed and all risk and liabilities including loss damage deterioration depreciation contamination evaporation or shrinkage to the Bunkers delivered and responsibility for loss damage and harm caused by pollution or in any other manner to third parties shall pass to the Buyer

from the time the Bunkers reach the flange/connecting pipe line(s)/delivery hoses provided by the Seller on the barge/ tank truck/shore tank

G 13  If the Buyer for whatever reason is unable or refuses to receive the full quantity ordered  the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the undelivered Bunkers back to the storage or by having to sell the Bunkers in a degraded form or at a lower price  The Seller may exercise this right without prejudice to the Seller s other rights for damages or otherwise pursuant to these conditions

G 14  The Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of Bunkers  and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by the Buyer  The Vessel shall upon delivery test the Bunkers supplied by running her engines or auxiliaries or equipment  for which the Bunkers are supplied  for a minimum of 1 (one) hour  to determine that the Bunkers are satisfactory  In the event the Bunkers are not considered satisfactory the Seller and Supplier are to be notified in writing immediately after such test period has expired  Otherwise  it shall be deemed that the Bunkers were satisfactory and that in any event the Buyer has waived any right to claim in this regard

G 15  If delivery is required outside normal business hours or on local weekends  Saturday  Sunday  national religious or public holidays the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs

G 16  In the event the Bunker delivery is made by vessel or barge as a ship-to ship transfer  any damage caused by contact and/or collision and/or swell and/or other weather or sea related condition or incident  is to be dealt with by the Owners directly with the owners of the units involved  and Seller/Supplier shall not be held nor be responsible for any such damages  If  however  any of the involved units choose to pursue Seller and/or Supplier  Buyer will fully indemnify and hold Seller harmless in relation thereto

G 17  For safety reasons it is agreed that it is solely the Master of the bunkering barge that determines whether mooring alongside is safe  taking weather  swell and forecasts into consideration  Supplier/Seller not to be held responsible for any delays  demurrages  liquidating damages or similar whatsoever as a result of any eventual delays caused by any decision by the Master of the barge in this connection  Supplies being always performed weather permitting

G 18  Without prejudice to any other article(s) herein  any and all supply/ies will be based on as per best endeavours only if the receiving Vessel arrives outside the originally agreed time split as per the Order Confirmation forwarded

## H    TITLE

H 1  Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery  The provisions in this section are without prejudice to such other rights as the Seller may have under the laws of the governing jurisdiction against the Buyer or the Vessel in the event of non-payment

H 2  Until full payment of the full amount due to the Seller has been made and subject to Article G 14 hereof the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller  and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel  nor mix  blend  sell  encumber  pledge  alienate  or surrender the Bunkers to any third party or other Vessel

H 3  In case of non or short payment for the Bunkers by the Buyer  the Seller is entitled (but not obliged) to repossess the Bunkers without prior juridical intervention  without prejudice to all other rights or remedies available to the Seller

H 4  In the event that the Bunkers have been mixed with other bunkers on board the Vessel  the Seller shall have the right to trace its proprietary interest in the Bunkers into the mixed bunkers and/or a right of lien to such part of the mixed bunkers as corresponds to the quantity or net value of the Bunkers delivered

H 5  The provisions of this Chapter H do not prejudice or in any way limit the Seller s right to arrest/attach the Vessel and/or sister ship and/or any sister or associate ship and/or other assets of the Buyer (or the Owner of the Vessel or any other party liable)  wherever situated in the world  without prior notice

H 6  Where  notwithstanding these conditions  title in and to the Bunkers delivered has passed to the Buyer and/or any third party before full payment has been made to the Seller  the Buyer shall grant a pledge over such Bunkers to the Seller  The Buyer shall furthermore grant a pledge over any other Bunkers present in the  respective Vessel, including any mixtures of the delivered Bunkers and other bunkers  Such pledge

will be deemed to have been given for any and all claims of whatever origin and of whatever nature that the Seller may have against the Buyer

H 7    For the avoidance of doubt where a mortgagee bank enforces any rights against the Vessel and becomes a mortgagee in possession of the Bunkers then as bailee the mortgage bank is liable to the Seller for fulfilment of the Agreement

## I    PAYMENT – MARITIME LIEN

I 1    Payment for the Bunkers and/or the relevant services and/or charges shall be made by the Buyer as directed by the Seller within the period agreed in writing

I 2    Payment shall be made in full without any set off counterclaim deduction and/or discount free of bank charges to the bank account indicated by the Seller on the respective invoice(s)

I 3    (i) If at any time after delivery but before the due date the financial standing of the Buyer appears to the Seller (in its sole discretion) to have become impaired or unsatisfying the Seller may require immediate full payment of all its invoices due and/or those not yet due or such security as it shall deem to be satisfactory
(ii) In the event that the Buyer shall default in making any payment due the Seller may suspend deliveries of Bunkers until such payment has been made in full (together with default/delay compensation and costs) or the Seller may in its discretion elect to treat such default as a serious breach of the Agreement and thereupon terminate the Agreeqmen on whole or in part without prejudice to any claim against the Buyer for damages including cancellation charges Such termination or suspension shall not relieve the Buyer of any obligation undertaken by virtue of an Agreement so terminated
(iii) Where the Seller has extended any kind of credit facility to a group of companies or associated companies default by any one relevant Buyer in respect to any invoice of the Seller shall give the right to the Seller to cancel all credit arrangements of the entire group or of all the associates whereupon sub clauses I 3 (i) and I 3 (ii) shall apply as appropriate
(iv) Where the Seller fails to pay timely the Seller has the right to (without prejudice to its rights to receive default/delay compensation) take all appropriate steps to secure and enforce its claim the Seller may also unilaterally cancel any credit arrangements agreed with/extended to the Buyer
(v) All judicial and extrajudicial costs and expenses including pre action costs fees expenses and disbursements of the Seller s lawyers/attorneys at law incurred in connection with non payment or delayed payment or by any other breach by the Buyer of these conditions shall be for the Buyer s account immediately payable by the latter to the Seller In case of litigation the Buyers shall also pay all the relevant expenses to the Seller including but without limitation all his reasonable attorneys/lawyers fees costs and disbursements

I 4    Payment shall be deemed to have been made on the date of which the Seller has received the full payment and such is available to the Seller If payment falls due on a non business day the payment shall be made on or before the business day nearest to the due date If the preceding and the succeeding business days are equally near to the due date then payment shall be made on or before the preceding business day

I 5    Any delay in payment of the full sum due shall entitle the Seller to interest at the rate of 3 (three) per cent per month (compounded monthly for each month [or part thereof] of non payment) without prejudice to any rights or remedies available to the Seller Furthermore the Seller is entitled to charge a delayed payment administration fee of USD 1 50 per mton supplied or the equivalent thereof in local currency with a minimum administration fee of USD 350 00 for each delivery made All reasonable attorneys fees incurred by Seller in connection with the collection of overdue payments shall be for the sole account of the Buyer

I 6    Payments made by the Buyer in respect of a supply of Bunkers shall at all times be credited in the following order (1) costs of any kind or nature including but not limited to legal costs and attorneys fees (2) interest and aaministrational fee and (3) invoices in their order of age also if not yet due or in Seller s sole discretion to specify a payment to any such invoice Seller considers relevant

I 7    All costs borne by the Seller in connection with the collection of overdue payments including those of the Seller s own legal and credit department and including but not limited to reasonable attorneys fees whether made in or out of court and in general all costs in connection with breach of any agreement by the Buyer including but not limited to reasonable attorneys fees shall be for the sole account of the Buyer

I 8    The Seller shall at all times in its absolute discretion be entitled to require the Buyer to provide the Seller what the Seller deems to be proper security for the performance of all of Buyer s obligations under the Agreement Failing the immediate provision of such security upon Seller s demand the Seller shall be

entitled to stop any further execution of any agreement(s) between the parties until such time as the Buyer has provided the required security.

I.9    Where Bunkers are supplied to a Vessel, in addition to any other security, the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel. It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof; including but not limited to the reasonable attorney's fees), such maritime lien afforded to the Seller over the Vessel. In any event any applicable Law shall not prejudice the right of the maritime lien of the Seller afforded hereunder or by any other applicable Law, be it of the place of delivery, or the flag of the Vessel, or the place of jurisdiction and/or an arrest of the Vessel, or otherwise howsoever.

I.10   It is mutually agreed that the Bunkers provided by the Seller to the Buyer under the terms of this Agreement have been ordered by the Buyer in the ordinary course of business between Seller and Buyer. All payments from Buyer to Seller for Bunkers supplied under this Agreement are deemed to have been made in the ordinary course of business between Seller and Buyer, according to these ordinary business terms agreed between them.

## J.    CLAIMS

J.1    In addition to the obligations referred to in Article E.4 and E.5 herein, any claim in connection with the quantity of the Bunkers delivered must be notified by the Buyer, or the Master of the Vessel, to the Seller or Supplier immediately after completion of delivery in the form of a letter of protest. If the Buyer or the Vessel's Master fails to present such immediate notice of protest to the Seller or Supplier, such claim shall be deemed to have been waived and shall be absolutely barred for all purposes.

J.2    Always without prejudice to Article G.14 herein, any and all claims concerning the quality of the Bunkers delivered or time consumed for the entire operation, shall be submitted to the Seller in writing within 15 (fifteen) days after delivery with a clear statement as to the nature or the claim(s) along with appropriate supporting documentation, failing which any rights to complain or claim compensation of whatever nature shall be deemed to have been waived and absolutely barred for all purposes.

J.3    The Buyer shall be obliged to make payment in full and fulfil all other obligations in accordance with the terms of the Agreement and these conditions, whether or not it has any claims or complaints. If Buyer submits a claim against Seller with respect to the quality or quantity of the products supplied, the Seller or the Seller's nominated representative shall be entitled to board the Vessel and investigate the Vessel's records, log books, engine logs, etc, and to make copies of any such document the Seller or the Seller's nominated representative may consider necessary for its investigations connected to the case. The Buyer shall allow this, or where Buyer has chartered the Vessel then the Buyer shall obtain authorization from Owner to allow the herein stated steps and to provide full assistance and support by the Vessel's officers and crew in any such manner the Seller or Seller's nominated representative may require. Failure to allow boarding and/or produce required copies of documents and/or lack of full cooperation by the Vessel's officers and crew shall constitute a waiver of the Buyer's claim.

J.4    The Seller shall be allowed, and the Buyer, Owner, Officers and Crew onboard the receiving Vessel shall agree and in any way support and cooperate with Seller's representative, to draw samples from the Vessel's storage tanks, settling tanks and service tank and/or from before and after the Vessel's centrifuges to have extra tests carried out for such samples at independent laboratory.

J.5    In each and every case, any and all claims of the Buyer shall be timebarred unless arbitration/legal proceedings have been commenced/issued at the competent tribunal/court set forth in Chapter P hereof and served within 12 (twelve) months from the date of delivery of the Bunkers, or the date that delivery should have commenced pursuant to the Order Confirmation from the Seller.

## K.    LIABILITY – LIMIT TO SELLER'S LIABILITY

K.1    The Seller and/or Supplier shall not be liable for damages of whatever nature, including physical injury, nor for delay of delivery of Bunkers or services, no matter whether such damages or delay have been caused by fault or negligence on the side of the Seller. The Seller shall furthermore not be liable for damages or delay as described above when such damages or delay have been caused by the fault or negligence of its personnel, representatives, Supplier or (sub)contractors.

K.2    Liabilities of the Seller for consequential and/or liquidated damages including but not limited to loss of time, loss of cargo or charter cancelling date, loss of income or profit/earnings, are excluded. In any event and notwithstanding anything to the contrary herein, liability of the Seller shall under no

circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel.

K.3    The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred on the Seller due to a breach of contract and/or fault or neglect of the Buyers, its Supplier, agents, Servants, (sub)contractors, representatives, employees and the officers, crews and/or other people whether or not on board of the Vessel(s). The Buyer furthermore undertakes to hold the Seller harmless in case of any third party institutes a claim of whatever kind against the Seller whether direct or indirect relation to any agreement regulated by these terms and conditions. Third party shall mean any other (physical or legal) person/company than the Buyer.

K.4    No servant, supplier or agent of the Seller/Supplier (including independent (sub)contractors from time to time employed by the Seller/Supplier) shall be liable to the Buyer for loss, damage or delay, while acting in the course of or in connection with its employment and/or agency for the Seller. Without prejudice to the above every exemption, limitation, condition and liberty herein contained, and every right, exemption from or limit to liability, defence or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall also be available and shall extend to protect every such servant, representative or agent of the Seller and/or the Supplier acting as aforesaid.


L.    **EXEMPTIONS AND FORCE MAJEURE**

L.1    Neither the Seller nor the Seller's Supplier shall be liable for any loss, claim, damage, delay or demurrage due to any delay or failure in their performance under this Agreement (a) by reason of compliance with any order or request of any government authority, or person purporting to act therefore, or (b) when supply of the Bunkers or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by the Seller or Supplier is interrupted, delayed by congestion or other event (also see Article G.3 above), or by unavailability of product and/or barge equipment or by inadequate resource for any cause whatsoever which interruption, delay, unavailability or inadequate resources is not within the immediate control of the Seller or the Supplier, including (without limitation) if such is caused wholly or partly by labour disputes, strikes, stoppages, lock-out, governmental intervention, wars, civil commotion, riot, quarantine, fire flood, earthquake, accident, storm, swell, ice, adverse weather or any act of God. Neither the Seller nor the Supplier shall be required to remove any such cause or replace any affected source or supply or facility if doing so shall involve additional expense or a deviation from the Seller's or the Supplier's normal practices. Neither the Seller, nor the Supplier shall be required to make any deliveries which fail in whole or in part as a result of the causes set out in this Article at any later time.

L.2    If the Buyer exercises reasonable diligence, the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure. The Buyer shall indemnify the Seller or the Seller's supplier for any damage caused by the Buyer, the Buyer's agent or employees in connection with deliveries hereunder.

L.3    Declaration of Force Majeure shall be given without unduly delay once such event(s) have come to the knowledge of the respective party declaring same. However, under no circumstances and for no reason whatsoever, can Force Majeure entitle the Buyer not to pay promptly any invoice of the Seller.

L.3    In the event that the Seller, as a result of force majeure, can only deliver a superior grade of bunkers, the Seller is entitled to offer the said grade, and the Buyer must accept delivery thereof and pay the applicable price.

L.4    (a)    These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions.  In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.

(b)    Without prejudice or limitation to the generality of the foregoing, in the event that the third party terms include:

(i)    A shorter time limit for the doing of any act, or the making of any claim, then such shorter time limit shall be incorporated into these terms and conditions.

(ii)    Any additional exclusion of liability clause, then same shall be incorporated mutatis mutandis into these.

(ii)    A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms and conditions.

(c)    It is acknowledged and agreed that the buyer shall not have any rights against the Seller which are greater or more extensive than the rights of the supplier against the aforesaid Third Party.

## M.    BREACH/CANCELLATION

M.1    Without prejudice to any other remedies and rights, the Seller shall have the option immediately to cancel the Agreement in full or in part, or to store or procure the storage of the Bunkers, in whole or in part, for the account and risk of the Buyer and to charge the Buyer the expenses thereby incurred, or to hold the Buyer fully to the agreement, or take any other measures which the Seller deems appropriate, without prejudice to its rights of indemnification, without any liability on the side of the Seller, in any one of (but not limited to) the following cases:

 a)  when the Buyer, for whatever reason, fails to accept the Bunkers in part or in full at the place and time designated for delivery;

 b)  when the Buyer fails in part or in full to comply with its obligations to pay any amount due to the Seller and/or provide security as set out in these GTC;

 c)  when, before the date of delivery, it is apparent in the opinion of the Seller that the financial position of the Buyer entails a risk to the Seller;

 d)  when, in case of force majeure, the Seller is of the opinion that the execution of the agreement should be cancelled.

M.2    The Seller may terminate any Agreement with the Buyer in whole or in part, in its full discretion, upon the breach of any provisions hereof by the Buyer or in the event that the Buyer fails to make or suspends payment, ceases to carry on business, makes an arrangement with its creditors or undergoes any form of bankruptcy, administration, re-organisation or asset rearrangement.

M.3    The Seller has the option to immediately cancel the Agreement for the account and risk of the Buyer if at any time the Seller, in its sole discretion, has reasonable grounds to believe that:

 a)  The Vessel; or

 b)  The Charterer of the Vessel; or

 c)  The fully or partly Owner(s) of the Vessel; or

 d)  Any officers of the Vessel; or

 e)  The Operator and/or Manager of the Vessel; or

 f)  Any other person or entity in any way related to the Agreement or delivery is/are

 1) Iranian(s); or

 2) Related in any way to Iran or Iranians; or

 3) Listed on the US OFAC Specially Designated Nationals List; or

 4) Covered by any US, UN- and/or EU sanctions; or

 5) Covered by any sanctions of any other jurisdiction and/or administration.

Under no circumstances can the Seller be held liable for any loss, delays, claims or damages of whatever kind suffered by the Buyer due to a cancellation under this Article.

The Buyer must inform the Seller immediately the Buyer becomes aware of or has reasons to believe that any of the above items a) to f) in combination with any of the above items 1) to 5) are fulfilled/apply. Should the Buyer breach its obligation to inform the Seller, the Buyer shall fully indemnify and keep the Seller harmless for any damage or loss caused by such breach, including consequential or liquidated damages.

M.4    The Buyer acknowledges that any agreements with the Seller and any actions related to such agreements as well as any interaction with third parties related to such agreements are covered by certain anticorruption laws and regulations which can include any anticorruption law, including but not limited to the U.S. Foreign Corrupt Practices Act ("FCPA"), and the UK Bribery Act.  Therefore, the Buyer declare to comply with all applicable anticorruption laws and regulations and agrees that the Buyer has not, and will not, offer, promise, pay, or authorize the payment of any money or anything of value, or take any action in furtherance of such a payment, whether by direct or indirect means, to any public official or private individual to influence the decision of such person in the performance of his duties to a government or to his company. Any breach of this clause will void the related Agreement and in the sole discretion of the Buyer any other Agreement between the parties, making any claims for payment, delivery or any other obligation of the Seller under this Agreement void. The Buyer is liable for all and any costs or losses incurred by the Seller due to such breach and/or an Agreement becoming void as a consequence.

## N.    SPILLAGE, ENVIRONMENTAL PROTECTION

N.1    If a spill occurs while the Bunkers are being delivered, the Buyer shall promptly take such action as is necessary to remove the spilled Bunkers and mitigate the effects of such spill. Without prejudice to the

generality of the foregoing the Seller is hereby authorised by the Buyer in the absolute discretion of the Seller, but at the expense of the Buyer, to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Bunkers and mitigate the effects of such spill. The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action. All expenses, claims, costs, losses, damages, liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission. If both parties have acted negligently, all expenses, claims, losses, damages, liability and penalties, shall be divided between the parties in accordance with the respective degree of negligence. The burden of proof to show the Seller's negligence shall be on the Buyer. The Buyer shall give the Seller all documents and other information concerning any spill or any programme for the prevention thereof that is required by the Seller, or is required by law or regulation applicable at the time and place of delivery.

## O.    DELAYS AND CANCELLATIONS

O.1    Notwithstanding anything else to the contrary herein, and without prejudice to any rights or remedies otherwise available to the Seller, the Buyer, by its acceptance of these conditions, expressly agrees that Seller has the sole discretion to cancel or to adjust prices in the event the Vessel is suffering a delay exceeding 24 hours from the (last) nomination date.

O.2    If the Buyer for whatever reason (including circumstances entirely outside Buyer's control) cancels the Agreement, where Order Confirmation has been sent by Seller, the Buyer shall be liable for any and all losses suffered and liabilities incurred by the Seller and/or the Supplier as a result of such cancellation, including, but not limited to, barge costs, re-storing of the Bunkers, and hedging costs, and also in Seller's sole option any difference between the contract price of the undelivered product and the amount received by the Seller upon resale to another party or, if another buyer cannot be found, any market diminution in the value of the product as reasonably determined from available market indexes. These losses and liabilities shall be indemnified by a minimum amount of USD 4,000 by way of agreed minimum liquidated damages, and shall be indemnified in full if they in total exceed USD 4,000.

## P.    LAW AND JURISDICTION

P.1    This Agreement shall be governed and construed in accordance with English law.
The 1980 United Nations Convention on Contracts for the International Sale of Goods (CISG) shall not apply.
Except for circumstance referred to in Clause P.5 below all disputes arising in connection with this Agreement or any agreement relating hereto, save where the Seller decides otherwise in its sole discretion, shall be finally settled by arbitration in London, England in accordance with the Arbitration Act 1996 (or any subsequent amendment).

P.2    In the event that the Seller determines to refer any dispute to arbitration it shall be referred to a tribunal of three arbitrators consisting of one arbitrator to be appointed by the Seller, one by the Buyer, and one by the two arbitrators already appointed. Each member of the tribunal shall be a full member of The London Maritime Arbitrators Association (the "LLMA"). Either party may call for Arbitration by service of written notice, specifying the name and address of the arbitrator appointed and a brief description of the dispute(s) or difference(s) to be the subject or the Arbitration. If the other party does not within 14 days serve notice of appointment of an arbitrator to arbitrate the dispute(s) or difference(s), then the first moving party shall have the right without further notice to appoint its own arbitrator as sole arbitrator and shall subsequently advise the other party accordingly. The award of the sole arbitrator shall be binding on both parties as if he had been appointed by agreement.  Provided each party appointed their own arbitrator then these two arbitrators shall jointly appoint the third arbitrator. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either party may apply to the English courts for the appointment of a third arbitrator.
Any disputes to be referred to Arbitration are to be determined in accordance with the current LMAA terms unless the parties agree otherwise.

P.3    Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

P.4    In cases where neither the claim nor any counterclaim exceeds the amount of USD 100,000 (or such other sum as the parties may agree) the Arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

P.5    The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Seller shall be entitled to assert

its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any jurisdiction where the Vessel may be found.

Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim arisen in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York.

P.6    If any procedure of any nature whatsoever is instituted under Clause P.5 above, in connection with any controversy arising out of this Agreement or to interpret or enforce any rights under this Agreement, the prevailing party shall have the right to recover from the losing party its reasonable costs and attorneys' fees incurred in such proceeding.

## Q.    VALIDITY

Q.1    These terms and conditions shall be valid and binding for all offers, quotations, prices and deliveries made by the O.W. Bunker Group, any associated company, representative or agent as of September 1, 2013, or at any later date.

Q.2    These terms and conditions are available at the website www.owbunker.com, on which site as well the Sellers may notify amendments, alterations, changes or verifications to same. Such amendments, alterations, changes or verifications are deemed to be a part of the entire terms once same have been advised on the website.

# EXHIBIT 4

 **CHEMOIL**

# General Terms and Conditions for the Sale of Marine Fuels

These General Terms of Sale for Marine Fuels ("Terms of Sale"), in conjunction with the confirmation agreement ("Confirmation Agreement"), shall be collectively referred to as the "Contract" and contain the entire agreement between the parties and supersede all prior agreements, arrangements and understandings in respect of the same subject. In the event of a conflict between the Confirmation Agreement and the Terms of Sale, the Confirmation Agreement shall take precedent. The Contract shall be deemed firm and binding upon the issuance by Seller of a Confirmation Agreement, unless the Buyer provides Seller with written notification of any objections, errors or omissions within twenty four (24) hours of the date and time that the Confirmation Agreement is sent. The Terms of Sale shall apply to sales by the Chemoil Energy Ltd Group of Companies ("Seller") of bunker fuel oil, intermediate bunker fuels, marine diesel oil, and marine gas oil (collectively hereinafter "Marine Fuels"). As used in the Contract, "Affiliates" means any legal entity which controls, is controlled by, or is under common control with, another legal entity, and "control" means legal or beneficial ownership of fifty percent (50%) or more of the shares in a legal entity entitled to appoint directors or the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity.

## Prices

- **(a)** The price for Marine Fuels shall be Seller's spot or term price offered and agreed in the Confirmation Agreement for a specific delivery or series of deliveries. Spot prices offered shall be valid for deliveries made on the Accepted Delivery Date.
- **(b)** Buyer shall pay any taxes (foreign or domestic, VAT, GST, excise and similar taxes), duty, toll, fee, license, impost or other charge, imposed by any taxing authority on the delivery, sale, inspection, storage or use of Marine Fuels, except for taxes on Seller's income. To the extent Seller incurs any of Buyer's taxes listed in the Contract, Seller's invoice will include such taxes as payable by the Buyer. If Buyer is entitled to purchase any Marine Fuels free of any taxes, duties or charges pursuant to local law, Buyer shall promptly, but in any event not later than five (5) business days following completion of delivery, provide to Seller a valid exemption certificate for such purchase.

## 2. Credit of Vessel

- **(a)** Marine Fuels delivered hereunder are sold and delivered on the financial credit of the vessel being supplied (the "Vessel"), as well as on the promise of the Buyer to pay. Buyer warrants that Seller shall have the right to assert a maritime lien, attachment or claim against the Vessel to which Marine Fuels is delivered for the purchase price, any extra charges incurred in accordance herewith, any taxes billed on the delivery of Marine Fuels or otherwise, any interest due thereon including on overdue payments and all associated recovery costs should Buyer fail to pay for Marine Fuels on time. Such remedy shall be in addition to, and not in limitation of, any other

**CHEMOIL**

remedies available to Seller. Buyer warrants that the Marine Fuel purchased hereunder is for the operation of the receiving Vessel and that Vessel only.

- **(b)** Buyer shall provide the full contact details of owners, managers and the Master of the Vessel (the "Vessel Interests"), to which Marine Fuels are to be supplied before the issuance of a Confirmation Agreement by Seller. Buyer authorizes Seller to contact Vessel Interests at Seller's sole option, in advance of delivery of Marine Fuels to put the Vessel on notice that the sale and delivery is made on the basis of the financial credit of the Vessel as well as Buyer and on the terms and conditions of this Contract. Seller not contacting the Vessel Interests however shall not limit Seller's rights. Should the Vessel Interests give notice to Seller that financial credit of the Vessel is denied before delivery of Marine Fuels to the Vessel is made, no credit can be granted to Buyer and the Marine Fuels shall be paid for in cash or equivalent by Buyer prior to delivery

- **(c)** Any notice by Buyer that a maritime lien on the Vessel may not be created because of the existence in Buyer's charter party of a prohibition of lien clause or similar clause, or for any other reason, must be given to Seller in the initial order for Marine Fuel (hereinafter defined as the Nomination). In the event Buyer provides notice of such restriction, no credit can be granted to Buyer and the Marine Fuel shall be paid for in cash or equivalent prior to delivery. Any notice of such restriction given by Buyer, its agents, Vessel Interest, the Vessel's personnel or other person later than in the Confirmation Agreement shall not modify the Terms of Sale except that any granting of credit by Seller is rescinded on receipt of the notice, with full payment due forthwith from Buyer.

## 3. Quality and Warranty

- **(a)** Marine Fuels shall be Seller's commercial grades of Marine Fuels available at the time and place of delivery. Unless otherwise indicated to Buyer in writing by Seller, any information provided to Buyer regarding the characteristics of Marine Fuels at any delivery location shall not be construed as specifications of the Marine Fuel to be delivered hereunder, but only as indications of the general characteristics of the Marine Fuels available at that location from time to time. **EXCEPT FOR THIS SECTION MARINE FUELS ARE SOLD "AS IS", AND SELLER OTHERWISE MAKES NO REPRESENTATIONS, GUARANTEE, CONDITIONS OR WARRANTIES OF QUALITY, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND ANY IMPLIED WARRANTIES OR CONDITIONS AS TO QUALITY, MERFCHANTABILITY OR FITNESS WHATSOEVER, WHETHER STATUTORY OR OTHERWISE ARE EXPRESSLY EXCLUDED.**

- **(b)** Buyer shall have the sole responsibility for the selection of suitable Marine Fuels for use in the Vessel. Buyer warrants that the Marine Fuels selected by Buyer for the Vessel are suitable for the Vessel. Buyer warrants that the Vessel nominated by Buyer to receive Marine Fuels is in compliance with all applicable local, national and international regulations and requirements and is free of all conditions, difficulties, peculiarities, deficiencies or defects that might impose hazards in connection with its mooring, unmooring or bunkering.

## 4. Nominations and Deliveries

- **(a)** Buyer shall nominate a Vessel in writing at least five (5) Business days (defined as days on which banks are normally open for business at the delivery port or other location where sales hereunder are made) in advance of the Vessel's Estimated Time of Arrival (the "ETA"). Buyer shall specify the delivery port, ETA and grades, specifications and quantities of Marine Fuels

 **CHEMOIL**

required (the "Nomination"). If such Nomination is accepted and confirmed in writing by Seller through the issuance of a Confirmation, the ETA proposed by Buyer shall become the "Accepted Delivery Date" unless otherwise agreed in writing by Seller. Unless advised in writing by Buyer and accepted in writing by Seller, amendments to the Accepted Delivery Date will not be recognized. Seller may cancel any nomination without liability and without prejudice to any rights Seller may have against Buyer if the Vessel does not present itself for delivery on the Accepted Delivery Date. Seller shall be permitted to accept "prompt" nominations, those nominations given with less than five (5) Business days advance notice. However, such "prompt" nominations will only be supplied on a best endeavors basis and Seller shall have no liability for any delay in the delivery of Marine Fuels with respect to a "prompt" nomination. The Vessel is subject to Seller's acceptance and Seller may refuse to supply Marine Fuels to the Vessel.

- **(b)** In addition to the Nomination, Buyer shall give Seller at least forty-eight (48) hours advance written notice, excluding Sundays and non-Business days, confirming the delivery date, type and quantities of Marine Fuels and providing other delivery details. If such proposed delivery date is a date other than the Accepted Delivery Date, Buyer shall be in breach of the Contract, however, Seller may waive such breach and accept the proposed revised delivery date (the "Revised Delivery Date") and Seller may, at its option, accept such proposed revised delivery date and change the price to reflect current market prices. If Buyer objects to the price change, Seller shall have the right to cancel the order without any further obligation or liability on the part of Seller and Seller may consider Buyer in breach of the Contract. If Buyer fails to provide at least forty-eight (48) hours advance notice Buyer is in breach of this Contract.

- **(c)** When delivery is required other than during normal business hours, and is permitted by applicable port regulations, Buyer shall be fully responsible and pay all overtime and other associated extra expenses incurred by Seller.

- **(d)** When delivery is made by barge, truck or coastal tanker (hereinafter collectively "Delivery Vessel"), all delivery charges, including overtime and associated charges, shall be for the account of Buyer. For delay caused by Buyer in the use of Delivery Vessel, Buyer shall pay any demurrage or detention charges at such rate as may be invoiced by Seller.

- **(e)** Buyer shall notify Seller, in writing at least forty-eight (48) hours prior to delivery (excluding Sundays and non-Business days), of the maximum allowable pumping rate and pressure for the Vessel and Buyer and Seller shall agree on communication and emergency shutdown procedures. If the Vessel's actual receiving rate for Marine Fuels falls below the minimum level set forth in the Confirmation Agreement and the barging company imposes demurrage or other costs due to the slow delivery, all such costs shall be for the Buyer's account.

- **(f)** Buyer shall notify Seller, in writing at least forty-eight (48) hours prior to delivery (excluding Sundays and non-Business days), of any special conditions, difficulties, peculiarities, deficiencies or defects in respect of or particular to the Vessel that might adversely affect the delivery of Marine Fuels. Buyer shall be responsible for any increased costs incurred by Seller in connection therewith. If such special conditions, difficulties, peculiarities, deficiencies or defects exist, Seller may, at its option, cancel the nomination without liability.

- **(g)** When delivery is to be made by the Delivery Vessel, the Vessel shall provide a free and safe berth for the Delivery Vessel alongside the Vessel to receive Marine Fuels and render all necessary assistance that may reasonably be required to safely moor and unmoor the Delivery Vessel.

- **(h)** Buyer shall be responsible for connection of the loading hose to the intake of the Vessel from the Delivery Vessel and shall monitor and direct safe receipt of the Marine Fuels by the Vessel.

# CHEMOIL

- **(i)** If Buyer cancels, terminates or otherwise fails to take delivery, in whole or in part, of the quantities nominated, Buyer shall be responsible for any costs resulting from such failure, including without limitation, lost profits and any costs and expenses incurred by Seller to downgrade Marine Fuels or return unaccepted quantities of Marine Fuels. In such instance, Seller shall not be responsible for any costs resulting from such failure, including without limitation, replacement costs and expenses incurred by Buyer.
- **(j)** Seller shall not be responsible for demurrage on the Vessel if Seller is prepared to commence delivery at any time on the Accepted Delivery Date or the Revised Delivery Date. Seller shall exercise reasonable efforts to adjust to changes in Buyer's schedule. However, Seller or Seller's supplier shall not be liable for demurrage paid or incurred by Buyer due to any delay in delivery of Marine Fuels if:
    - ○ **(1)** the delivery date, which is defined as the date on which hoses are disconnected, was not within the Accepted Delivery Date or was not otherwise accepted by Seller as outlined in Sections 4(a) and 4(b);
    - ○ **(2)** forty-eight (48) hours advance notice, as defined in Section 4(b), was not given;
    - ○ **(3)** Seller's Delivery Vessel arrived in a timely fashion and performed according to accepted practice;
    - ○ **(4)** conditions as set forth in Section 11 below existed;
    - ○ **(5)** Seller was ready and able to perform; or
    - ○ **(6)** conditions onboard the Vessel resulted in failure to receive Marine Fuels.
- **(k)** Should Seller fail to deliver Marine Fuels on the Accepted Delivery Date or the Revised Delivery Date, any claim involving demurrage incurred by the Buyer's Vessel must be submitted by Buyer to Seller in writing within thirty (30) days of the date of delivery. If Buyer fails to submit a demurrage claim within thirty (30) days after the date of delivery, any such claim shall be deemed to be waived and absolutely barred.
- **(l)** All deliveries to Seller's customers will be made on a first come first served basis.

## 5. Title and Risk of Loss

- **(a)** Delivered to the Vessel. Delivery shall be deemed completed and title to and risk of loss of Marine Fuels shall pass to Buyer as Marine Fuels pass the permanent intake connection between the terminal's or Seller's Delivery Vessel's discharge hose and the Vessel.
- **(b)** Delivered to Buyer's Delivery Vessel. If delivery is made to a barge, truck or coastal tanker nominated by Buyer (hereinafter "Buyer's Delivery Vessel") delivery shall be deemed completed and title to and risk of loss of the Marine Fuels shall pass to Buyer as the Marine Fuels pass the last flange of the loading terminal or Seller's discharge vessel and the inlet flange of Buyers Delivery Vessel.

## 6. Inspection and Determination of Quantity and Quality

- **(a)** The quantity of Marine Fuels delivered shall be determined, at Seller's option, by measurements in accordance with either: (i) the ASTM Petroleum Measurement Table for Seller's shore tanks or Seller's Delivery Vessel; or (ii) Seller's meters. Buyer will be charged for Marine Fuels on the basis of these measurements. Buyer at its own expense has the right to have its representative or an independent inspector present during measurement, but determination of quantity shall be made solely by Seller. All such measurements noted above shall be final and binding save for fraud or manifest error.

# ◎ CHEMOIL

- **(b)** Except where contrary to local governmental or port regulations, sampling by Seller or Seller's supplier shall be accomplished by inline drip samplers if available or by the manual, beginning/middle/end method if in-line samplers are not available during the delivery process. Seller or Seller's supplier shall take four (4) representative samples of each grade of Marine Fuels to be delivered. Buyer shall have the right to have its representative witness the drawing of the samples. The aforementioned samples shall be securely sealed and labeled, numbered and identified by name of the Vessel, delivering facility, Marine Fuels type(s), delivery date and place of delivery. One (1) sample shall be given to Buyer's representative for MARPOL compliance purposes only; one (1) sample shall be given to Buyer's representative; and the remaining two (2) samples shall be retained by Seller or Seller's supplier ("Sellers Retained Sample") for thirty (30) days following the date of delivery in a safe place for subsequent verification of the quality thereof if required. Samples drawn at the receiving Vessel's manifold or from the receiving vessel's tank(s) shall not be considered valid as an indicator of the quality of Marine Fuels supplied

## 7. Claims

- **(a)** Notwithstanding anything in this Contract to the contrary, (i) Seller's obligations or liabilities hereunder shall not include any consequential or indirect damages, including without limitation, deviation costs, demurrage, damage to any Vessels or Buyer's Delivery Vessels or to their engines or tanks, and any actual or prospective loss of profits, and (ii) other than provided in Section 7(f) or in the event of personal injury or death, Seller's maximum liability under this Contract shall not exceed the lesser of the price charged to the Buyer for the Marine Fuels supplied under this Contract or the sum of USD Three Hundred Thousand (US$300,000.00). Buyer agrees that no claim of USD Two Thousand (US$2,000.00) or less shall be made under this Contract.
- **(b)** Any dispute as to the quantity of Marine Fuels delivered must be noted at the time of delivery on the bunker delivery receipt or in a letter of protest and presented to Seller by Buyer in writing within thirty (30) days of the date of delivery, failing which any such claim shall be deemed to be waived and absolutely barred. As provided for in Section 6(a) above, quantity determination will be made on the basis of Seller's shore tanks or Seller's Delivery Vessel or Seller's meters. Quantity calculations and quantity claims made on the basis of Buyer's Vessel's measurements shall not be applicable. Quantity claims made on the basis of alleged incorrect density used for Seller's quantity determination shall be addressed by means of analysis of a Seller's sample at a mutually agreed independent laboratory. Should the independent laboratory's determination of density fall within the established test precision range for density, no adjustment to the invoice quantity shall be made and the costs for the analysis of the independent inspector shall be borne by the Buyer. Should the independent laboratory's determination of density fall outside the established test precision range for density the invoiced quantity shall be adjusted, either higher or lower, accordingly and the costs for the analysis of the independent inspector shall be borne by the Seller.
- **(c)** Any claim as to the quality of the Marine Fuels delivered must be submitted by Buyer to Seller in writing within thirty (30) days after the date of delivery, failing which, such claim shall be deemed waived and absolutely barred. Buyer shall base its quality claim solely on an analysis of the retained sample provided by Seller at the time of the delivery and include complete supporting documentation; however such analysis shall not be considered determinative of the claim. Providing Buyer issues a claim regarding the quality of the Marine Fuels within thirty (30)

## CHEMOIL

days after the date of delivery, one (1) of the two (2) remaining samples of Seller Retained Samples shall be submitted for analysis to a mutually agreed independent laboratory. The independent laboratory's analysis shall be conclusive and binding, absent manifest error or fraud, as to the quality of the Marine Fuels delivered. The analysis shall be established by tests in accordance with ISO 8217 and/or any other specifications agreed to between Buyer and Seller in writing within the Confirmation Agreement. Unless otherwise agreed, should the independent laboratory's analysis confirm that on-specification fuel has been delivered the expenses of the analysis by the independent laboratory shall be borne by the Buyer. Should the independent laboratory's analysis confirm that off-specification fuel has been delivered the expenses of the analysis by the independent laboratory shall be borne by the Seller. Any cost associated with the Buyer appointing a representative to witness the sample seal-breaking and/or analysis at the independent laboratory shall be the sole responsibility of Buyer.

- **(d)** Buyer shall take all reasonable measures, including retention and burning of Marine Fuels in accordance with Seller's instructions, to eliminate or minimize any costs associated with an off-specification or suspected off-specification supply. Subject to and not to exceed the maximum liability of $300,000 as stated in Section 7 (a) above, Seller will be responsible ONLY for direct expenses incurred for removal and replacement of Marine Fuels. If Buyer removes such Marine Fuels without the consent of Seller, then all such removal and related costs shall be for Buyer's sole account.
- **(e)** Seller shall not be responsible for any claim whatsoever arising in circumstances where there is or has been commingling of Marine Fuels delivered by Seller with other fuel aboard the Vessel or Buyer's Delivery Vessel.
- **(f)** The parties shall endeavor to resolve the matter one way or the other within forty-five (45) days of receipt of claim. If Seller responds to the Buyer regarding any complaint or claim and Buyer does not acknowledge such response within fifteen (15) days, then the complaint or claim shall be considered closed unless otherwise agreed to in writing by the Seller. Where Buyer and Seller cannot come to agreement on such claim within ninety (90) days from when it was made, either party may invoke the dispute resolution procedures in accordance with the provisions of Section 14 below. However, nothing in this Section 7 shall relieve the Buyer of its obligation to make payments in full when due without offset or deduction as provided herein.
- **(g)** Notwithstanding the foregoing, if the Marine Fuels supplied to Buyer from Seller was done on a back-to-back basis such that that the physical supplier of the Marine Fuels was a third party, Buyer's recovery from Seller for claims against Seller shall be limited to the funds received by Seller from the third party supplier.
- **(h)** In certain locations, Seller utilizes third-party independent operators to provide barging and towage services in connection with the delivery of the Marine Fuels. Seller is not liable for the acts or omission of such operators but, to the extent that Buyer has a claim against such operator, Seller (at the request of Buyer) shall provide the contact information of such operator so that Buyer can pursue a claim directly against such operator.
- **(i)** It is a condition precedent to any obligation or liability whatsoever for payment by the Seller that all sums due to it from the Buyer shall have first been paid.

## 8. Payment

- **(a)** Unless government regulations require otherwise, Seller shall have the right to invoice Buyer for deliveries of Marine Fuel based upon facsimile or electronic advice or other written communication of delivery details in lieu of original delivery documents. Original delivery

 CHEMOIL

documents may be provided to Buyer if requested, but payment shall not be conditional upon Buyer's receipt of such documents. Payment shall be made by Buyer, in U.S. dollars, without discount, offset or deduction whatsoever prior to the time specified in Section 8(b) and in accordance with Seller's written, telegraphic or other notification of invoice specifying quantities of Marine Fuels delivered and amounts due. Seller may make subsequent adjustments to invoiced amounts based upon information contained in the relevant bunker delivery receipt. Buyer's failure to make payment in frill of the amount noted by Seller shall be considered a material breach of Buyer's obligations under this Contract. Any claims related to the delivery of Marine Fuels shall not relieve Buyer from paying Seller in full.

- **(b)** Unless Seller agrees to extend credit to Buyer, payment is due prior to delivery of the Marine Fuels. If Seller agrees to extend credit to Buyer, payment shall be considered past due if not received by Seller within thirty (30) days after the date delivery of Marine Fuels is completed. Overdue payments shall be subject, at Seller's sole discretion, to interest at the rate of two percent (2%) per thirty (30) day period or the maximum rate permitted under applicable law.
- **(c)** The Buyer shall periodically provide to Seller that financial information or security deemed necessary by Seller to support any credit extension. If during the life of this Contract, the financial capacity of Buyer becomes impaired or unsatisfactory to Seller in the sole judgment of Seller, advance cash payment or security satisfactory to Seller shall be given by Buyer on demand by Seller and shipments/deliveries may be withheld until such payment or security is received.
- **(d)** If payment is not made within 30 days of the date of delivery, or if credit is withdrawn and payment not made upon demand, Seller shall have the right to immediately cancel this Contract.
- **(e)** Buyer shall be liable for attorneys' fees and collection expenses whether or not suit is filed. If suit is filed, Buyer shall be liable for all court costs in addition to attorneys' fees and expenses. Said fees, expenses and costs, together with interest shall constitute a part of the Seller's maritime lien on the Vessel. Should Buyer be in default on this Contract for failure to pay, Seller, or Seller's Affiliates shall have the right to cancel any other contracts between Seller and/or its Affiliates and Buyer and/or its Affiliates.

## 9. Safety and Environmental Protection

- **(a)** If, at any time prior to or during delivery, Seller reasonably determines that the circumstances for delivery are unsafe or have the potential for a spill (as defined in Section 9 (c) below) occurring due to conditions such as, but not limited to, unsafe or inadequate working environment, practices or procedures, facilities, tools or equipment, incompatible configurations or bad weather, Seller reserves the right not to commence delivery or to terminate the supply immediately without any prior notice to Buyer and without liability. Buyer shall be solely responsible for any loss or damage occurring on board or to the Vessel resulting from any incident arising out of or in connection with any such conditions.
- **(b)** By purchasing Marine Fuels from Seller, Buyer warrants that it is familiar with the health effects related to Marine Fuels supplied hereunder and with relevant protective safety and health procedures for the handling and use of such Marine Fuels. Buyer shall adhere to such safety and health procedures while using or handling Marine Fuels. Buyer shall also facilitate the dissemination of health and safety information to all employees, users, and others potentially exposed to Marine Fuels sold hereunder. Buyer shall be responsible for compliance by its employees, agents or contractors, and other users with all health and safety requirements or recommendations related to Marine Fuels supplied hereunder and shall exert its best efforts to

 **CHEMOIL**

assure that any of its employees or agents, users, and others avoid frequent or prolonged contact with or exposure to Marine Fuels both during and subsequent to delivery. Seller or Seller's supplier accepts no responsibility for any consequence arising from failure by Buyer, its employees, agents, contractors, any users, or any other party to comply with relevant health and safety requirements or recommendations relating to such contact or exposure.

- **(c)** If a spill occurs while Marine Fuels are being delivered, Buyer and Seller shall promptly take such action as is reasonably necessary to contain and remove the spilled Marine Fuels and mitigate the effects of such spills. Seller is hereby authorized, at its option and at the expense of Buyer, to take such measures and incur such expenses (whether by employing its own resources or contracting with others) as are reasonably necessary in the judgment of Seller to remove the spilled Marine Fuels and mitigate the effects of such spills. Buyer shall cooperate and render such assistance as is required by Seller in the course of such action. All expense, claims, loss, damage, liability and penalties arising from spills shall be borne by the party that caused the spill. If both parties are at fault, all expense, claims, loss, damage, liability and penalties shall be divided between the parties in accordance with the respective degrees of fault.
- **(d)** In the event of a spill during fueling, Buyer shall provide Seller with such documents and information concerning the spill and any programs for the prevention of spills as may be required by Seller or by law or regulations applicable in the port where the spill occurred.
- **(e)** Buyer shall comply with all applicable laws and regulations in carrying out its obligations under this Contract, including the ISPS Code and to the extent applicable, MARPOL 73/78 Annex VI. Seller and its duly authorized representatives shall have access to the accounting records and other documents maintained by the other party which relate to Marine Fuels being delivered under this Contract, and shall have the right to audit such records once a year at any reasonable time or times within twenty-four (24) months of the rendition of any statement or invoice forming the basis of such claim.

## 10. Indemnity

- **(a)** Buyer shall indemnify and hold Seller and Seller's Affiliates and suppliers harmless from and against any and all claims, demands, suits or liabilities for damage to property or for injury or death of any person, or for non-compliance with any requirement of any governmental entity arising out of an act or omission of Buyer, the Vessel or Vessel Interests or agents or servants in receiving, using, storing or transporting Marine Fuels delivered hereunder, including exposure thereto, unless the same be due to the sole negligence of Seller.
- **(b)** Buyer shall indemnify and hold Seller harmless as to any claims, expenses, losses, taxes or penalties arising from Buyer's breach of any of its warranties, including legal fees, interest, costs and expenses.

## 11. Force Majeure

- **(a)** Seller shall not be in breach of its obligations, or be responsible for any loss, damage, delay or failure, in the event that performance is prevented or delayed as a result of any one or more of the following events: (1) labor disturbance, strike, stoppage or lock-out, whether involving the employees of Buyer, Seller, its supplier, its barging contractor or otherwise, and regardless of whether the disturbance, strike, stoppage or lock-out could be settled by acceding to the demands of the labor group or laborers involved; (2) compliance with a change, request, direction, order, regulation or law of any governmental authority or agent; (3) shortage in raw

 **CHEMOIL**

material, marine or land transportation, manufacturing, blending or storage facilities or Marine Fuels, whether in whole or in part from the Seller's source of supply; (4) war, civil war, insurrection, commotion or disturbance, acts of terrorism or piracy, tumult, riot, quarantine, arrest, restraint of princes, rulers or people (whether officially declared or not) affecting the port or place of delivery or access thereto; or (5) the effect of adverse weather (including but not limited to hurricanes, typhoons, gales, storms, snow, sleet, hail, lightening, wind, waves, flooding and landslides), mechanical breakdown, breakdown of or damage to facilities, plant, equipment, machinery, bunkering barge or any other form of vessel or vehicle or, act of God; or (6) any other cause whatsoever and howsoever arising which is beyond the reasonable control of the Seller, whether or not foreseeable ("Force Majeure").

- **(b)** In the event that performance is prevented or delayed Force Majeure, the Seller may cease or reduce deliveries in any manner as it may determine in its sole discretion. Nothing in the provision shall be deemed to excuse Buyer from its obligation to make payments for Marine Fuels delivered.

## 12. Bonded Marine Fuels

Marine Fuels in bond, when available to Seller, may be delivered, provided Buyer qualifies to receive such Marine Fuels. Buyer shall reimburse Seller for any tariff, tax, duty, penalty or other charges subsequently assessed for any reason, including the failure of Buyer to furnish the necessary qualifying proof within thirty (30) days of delivery.

## 13. Miscellaneous

- **(a)** Except as otherwise expressly provided herein, no director, employee or agent of Buyer, its subcontractors or vendors, shall give or receive from any director, employee or agent of Seller or any affiliate, any commission, fee, rebate, gift or entertainment of significant cost or value in connection with this Contract. In addition, no director, employee, or agent of Buyer, its subcontractors or vendors, shall enter into any business arrangement with any director, employee, or agent of Seller or any affiliate who is not acting as a representative of Seller or its affiliate without prior written notification thereof Buyer shall not pay or agree to pay, directly or indirectly, any funds or anything of value to any public official or official of a national or international organization for the purpose of influencing such person's official acts or decisions in violation of the applicable laws of the United States of America ("USA"), United Kingdom ("UK") or the laws of the jurisdiction in which the delivery of Marine Fuels was made.
- **(b)** Any representative(s) authorized by Seller may audit the applicable records of the last three years of Buyer for the sole purpose of determining whether there has been compliance with this Section 13(a).
- **(c)** Buyer may not assign its rights or obligations hereunder without the prior written consent of Seller, such consent not to be unreasonably withheld or delayed.
- **(d)** If any provision or portion of this Contract shall be adjudged invalid or unenforceable by a court or arbitral tribunal of competent jurisdiction or by operation of any applicable law, such provision or portion of this Contract shall be deemed omitted and the remaining provisions and portions shall remain in full force and effect.
- **(e)** Modifications or amendments to this Contract shall be valid only when expressly agreed upon in signed writing by Seller and Buyer. The waiver or failure to require the performance of

 **CHEMOIL**

any covenant or obligation contained herein shall not be deemed to constitute a waiver of a similar later breach.

- **(f)** Notices under this Contract shall be made and deemed duly given only when delivered in writing to the other party to the address set forth in the Confirmation Agreement, or such updated address as may be specified by a party from time to time.
- **(g)** Seller abides by international trade sanctions regulations, including those of the USA, UK and European Union and expressly reserves the right at any time, without liability, to terminate the Contract and/or not to fuel or deliver to Vessels or persons which are subject to or are carrying flags of any country(s) subject to US or international trade sanctions.
- **(h)** Where sales are concluded through a broker or an agent, commissions may be paid by Seller to such broker or agent. Any brokers' commission payable by Seller shall not be considered as making that agent or broker Seller's agent or broker and shall only be paid afler confirmation of receipt of full outstanding invoice amounts without offset.

## 14. Dispute Resolution

Except as otherwise provided herein, each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York or, if such court does not have jurisdiction or shall not accept jurisdiction, to any court of general jurisdiction in and for the County of New York in the State of New York for the resolution and determination of any dispute between the Parties relating to the construction, meaning or effect of this Contract, or the rights and liabilities of the Parties hereunder, or any matter arising therefrom or connected therewith. Each of the Parties hereby irrevocably waives objection to such suit based upon forum non conveniens and venue. Each of the Parties hereby irrevocably waives actual personal service of process in connection with any action initiated in any court to whose jurisdiction the Parties have by contract submitted, and agrees to accept, in lieu of such personal service, written notice of such action given by hand delivery or by certified or registered pre-paid mail (provided that notice shall also be given by telex, facsimile, or other written communication that such mailed notice has been sent, no later than the second day following the date of mailing) to its address as set out in the Special Terms or otherwise notified pursuant to this Contract, or to its principal place of business, and addressed to the Party in question, provided that either Party may cause service of process to be effected in any other lawful manner rather than by use of the aforesaid procedure. The United Nations Convention on Contracts for the International Sale of Goods 1980 shall not apply to this Contract. Notwithstanding the foregoing, Seller is free to bring suit in any jurisdiction and shall be entitled to avail itself of all remedies under maritime or other law to obtain jurisdiction and/or security for its claims against Buyer, its agents or Affiliates, the Vessel, her owners and charterers and any of their respective agents, servants or assigns, including but not limited to vessel arrest and attachment procedures under the Supplemental Rules of Civil Procedure for Certain Admiralty and Maritime Claims or any similar laws, rules or statutes in any jurisdiction.

## 15. Governing Law

- **(a)** This Contract shall be governed by and construed in all particulars by the laws of the State of New York (excluding its conflict of law rules which may result in the application of the laws of

 **CHEMOIL**

another jurisdiction) applying the principles of maritime law as applied in the federal District Courts of the United States of America. The maritime laws of the United States shall apply to any determination of the existence of a maritime lien, regardless of the country in which Seller takes legal action.

- **(b)** In the event of the potential application of both, or a conflict between, admiralty and bankruptcy jurisdiction, the Parties expressly agree that admiralty jurisdiction pre-empts bankruptcy jurisdiction with respect to the rights and obligations of the Parties under this Contract, and with respect to enforcing maritime lien or attachment rights

## 16. General Savings Clause

Notwithstanding anything to the contrary herein, nothing in this Contract is intended, and nothing herein should be interpreted or construed, to induce or require either Party hereto to act in any manner (including failing to take any actions in connection with a transaction) which is inconsistent with, penalized or prohibited under any laws of the United States of America which relate to foreign trade controls, export controls, embargoes or international boycotts of any type.

# **EXHIBIT 5**

# CLYDE&CO

Clyde & Co US LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: +212 710 3900
Facsimile: +212 710 3950

www.clydeco.us

November 12, 2014

**BY EMAIL, FEDEX AND FAX**
Birch Shipping Limited
c/o Maritime Capital Shipping Ltd
Unit 505, 5/F,
Ovest,
77 Wing Lok Street,
Sheung Wan,
Hong Kong
Fax: +852 3975 5610
Email: info@maritime-capital.com; info@seanergy.gr; tech-ops@maritimecapital.com

Woodstreet Incorporated
12th Floor, Warwick House East
TaiKoo Place
979 Kings Road
Quarry Bay
Hong Kong

Wallem Shipping (Singapore) Private Limited
02-04/05
991 Alexandra Road
Singapore
119964 , Republic of Singapore
Fax: +65 62719569
Email: wallemsing@wallem.com.sg; ftan@wallem.com.sg; fkan@wallem.com.sg

Clearwater Marine Investments
6th Floor
47 Mark Lane
London
EC3R 7QQ , United Kingdom
Fax: +44 0207 283 6653
Email: info@clearwater-marine.co.uk

Clyde & Co US LLP is a Delaware limited liability partnership with offices in Atlanta, New Jersey, New York and San Francisco.
Clyde & Co US LLP is affiliated with Clyde & Co LLP, a limited liability partnership registered in England and Wales

Birch Shipping Limited
c/o Maritime Capital Shipping Ltd
Woodstreet Incorporated
Wallem Shipping (Singapore) Private Limited
Clearwater Marine Investments
November 12, 2014
Page 2



Re:     BIRCH 6, IMO No. 9138628
        Bunker Delivery at Port of Panama
        Chemoil Latin America Inc. Delivery Receipt No.: 8470

Dear Sirs,

    We are New York attorneys representing Chemoil Latin America Inc. ("Chemoil").
Chemoil delivered marine fuel to your vessel BIRCH 6, on or about October 18, 2014, at the Port
of Panama. The full amount of Invoice No. 6004846 in the sum of $257,163.87 remains unpaid.
(Please see attached copies of invoice and bunker delivery receipt). Accordingly, Chemoil
demands that you make payment in accordance with the terms set forth in the attached invoice.
Chemoil reserves the right to enforce its maritime lien against the vessel for this amount unless
payment in full is received on or before November 17, 2014.

    Please promptly confirm to us that full payment will be made by November 17, 2014.
Failure to do so may result in the arrest of the vessel to enforce Chemoil's maritime lien.

    Chemoil reserves all of its rights under the contract, at law or otherwise.

                                    Very truly yours,

                                    John R. Keough

Enclosures

**Power, James H (NYC - X73494)**

| | |
|---|---|
| **From:** | Keough, John <John.Keough@clydeco.us> |
| **Sent:** | Friday, November 21, 2014 12:04 PM |
| **To:** | Power, James H (NYC - X73494) |
| **Subject:** | Re: Chemoil |

James,

I called your office.   We need to hear from you within the next hour or so to discuss security in lieu of arrest if any interest on your client's part.

John


John Keough
Partner | Clyde & Co US LLP
Direct Dial: +1 212 710 3983 | Fax: +1 212 702 4619

# CLYDE&CO

The Chrysler Building | 405 Lexington Avenue | 16th Floor | New·York | NY 10174 | USA
Main +1 212 710 3900 | Fax +1 212 710 3950 | www.clydeco.us


On Nov 20, 2014, at 10:27 PM, James.Power@hklaw.com wrote:

John

Please give me a call it is urgent. 2012382299.   .

James

Sent from my iPad

_____

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

ALERT: Do international trade sanctions affect your business? http://sanctions.clydeco.com

This email message and any attachments may contain legally privileged and/or confidential information intended solely for the use of the individual or entity to whom it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution or copying of this message or its attachments is strictly prohibited. If you have received this email message in error, please immediately notify us by telephone, fax or email and delete the message and all attachments thereto. Thank you. Clyde & Co US LLP is a Delaware limited liability law partnership affiliated with Clyde & Co LLP, a multinational partnership regulated by The Law Society of England and Wales.

Disclosure: To ensure compliance with requirements imposed by the IRS in Circular 230, we inform you that any tax advice contained in this communication (including any attachment that does not explicitly state otherwise) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing or recommending to another party any transaction or matter addressed herein.

# **EXHIBIT 6**



**CHEMOIL**

**Chemoil Latin America Inc.**
RUC 439366-1-429943 DV 40,
P.H.PLAZA CANAIMA, 19 TH FLOOR, CALLE
SAMUEL LEWIS ,OBARRIO , PANAMA 00785
Ph : 265-5070

## INVOICE

| Shipped To (Master and/or Owners and/or Charterers) | BIRCH 6 | | | Invoice | 6004846 |
|---|---|---|---|---|---|
| | | | | Date | 20/Oct/14 |

OW BUNKER USA INC

Attn : **BUNKER/OPS MANAGER**
2603 Augusta Drive
Suite 440
HOUSTON, TEXAS 77057

For Office Use

Order    4302323

| Product Description | Quantity | Unit | Unit Price | Amount(USD) |
|---|---|---|---|---|
| RMG 380 (2010) 3.5% | 400.170 | MT | 508.00000 | $203,286.36 |
| MGO DMA (2010) 0.1% | 47.060 | MT | 930.00000 | $43,765.80 |
| Barging | 1.000 | TOTAL | 7,500.00000 | $7,500.00 |
| Pipeline Fee | 2,930.370 | BBL | 0.50000 | $1,465.19 |
| Pollution Tax | 2,930.370 | BBL | 0.05000 | $146.52 |
| Weekend Charge | 1.000 | TOTAL | 250.00000 | $250.00 |
| Fuel Delivery Surcharge | 1.000 | TOTAL | 750.00000 | $750.00 |
| | | | Pay this amount : | $257,163.87 |

(USD TWO HUNDRED FIFTY-SEVEN THOUSAND ONE HUNDRED SIXTY-THREE AND 87 / 100 ONLY)

| Delivered On : | 18 Oct 14 | at  Port of PANAMA - BALBOA, PANAMA |
|---|---|---|
| Due Date : | 17 Nov 14 | |

*PAYABLE BY WIRE TRANSFER*

**PLEASE MAKE REMITTANCE TO :**
**SOCIETE GENERALE, NEW YORK BRANCH**
**NEW YORK, NEW YORK**
**SWIFT: SOGEUS33**
**ABA: 026004226**
**FOR CREDIT TO:**
**CHEMOIL LATIN AMERICA**
**ACCOUNT # 00202800**

For any questions regarding this invoice please contact us as follows
gmops@chemoil.com
Fax: 00 507 265 5088
Phone: 00 507 265 5070 extn 113



# MARINE FUEL DELIVERY RECEIPT

CHEMOIL LATIN AMERICA INC. •P.H. Plaza Canaima, 19 th Floor •Samuel Lewis Street •Panama
Phone: (507) 265-5070 • Fax (507) 265-5088 • E-mail: gmops@chemoil.com

Nº    8470

| VESSEL NAME: | IMO # : | BARGE NAME: | DATE: |
|---|---|---|---|
| BIRCH 6 | 9138628 | GREAT GATUN | 18/OCT/14 |

| LOADING TERMINAL LOCATION: | DELIVERY LOCATION: |
|---|---|
| DECAL | BALBOA ANCHORAGE |

| PRODUCT | GROSS BBLS | NET BBLS | WEIGHT M. TONS |
|---|---|---|---|
| HSFO | 2579.85 | 2543.70 | 400.17 |
| LSDMA | 350.52 | 347.61 | 47.06 |
|  |  |  |  |

## PROPERTIES

| GRADE | VISCOSITY CST /T 50ºC/122ºF | API AT 60ºF | DENSITY AT 15ºC | TEMP ºF | FLASH ºF | POUR ºF | WATER % VOL. | SULFUR % M/M | | DATE | TIME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HSFO | 195.4 | 11.2 | 0.9910 | 94 | 64C | -15C | 0.15 | 1.55 | BARGE ALONGSIDE | 18/10 | 1040 |
|  |  |  |  |  |  |  |  |  | HOSE CONNECTED | 18/10 | 1100 |
|  |  |  |  |  |  |  |  |  | STARTED PUMPING | 18/10 | 1230 |
| LSDMA | 2.59 | 35.0 | 0.8494 | 78 | 150 | -0- | 0.087 | | FINISHED PUMPING | 18/10 | 1400 |
|  |  |  |  |  |  |  |  |  | HOSE DISCONNECTED | 18/10 | 1450 |
|  |  |  |  |  |  |  |  |  | BARGE AWAY | 18/10 | 1740 |

**The fuel oil supplied is in conformity with regulation 14 (1) or 4 (a) and regulation 18 (1) of Marpol 73/78 Annex VI**

The marine fuel described herein is delivered in accordance with Chemoil Standard Terms and Conditions of Sale (a copy of which has been provided to buyer prior to delivery) and on credit of the vessel. Any disclaimers as to the creation of a maritime lien in the amount of the purchase price and delivery charges and/or restrictions as to the authority of the ship's officer signing this Receipt to bind the vessel and her owner to the above are null and void, unless an authorized representative of Chemoil shall have otherwise agreed in writing at the time Buyer initially orders the marine fuel. Failing such agreement, delivery shall, under no circumstances, constitute a waiver by Chemoil of the above.

REMARKS:

LSDMA
HC:1440
SP:1500
FP:1645
HD:1720

| | | HSFO | LSDMA |
|---|---|---|---|
| BARGE SAMPLE (SUPPLIER): | SEAL # | 261222/21. | 261226/25. |
| BARGE SAMPLE (VESSEL): | SEAL # | 261214. | 261228. |
| MARPOL ANNEX VI SAMPLE: | SEAL # | 261223. | 261227. |
| OTHER SAMPLE: | SEAL # | | |

SAMPLES GIVEN TO CUSTOMER    ☑ YES    ☐ REFUSED

GAUGES WITNESSED BY SHIP'S REPRESENTATIVE
☑ BEFORE    ☑ AFTER    ☐ DECLINED

DELIVERING COMPANY:    I.S.S.

BY:    CAP. LUIS SAGASTEGUI

DATE:    18/OCT/14 B/P Great Gatun

DECLARATION OF MASTER/CHIEF ENGINEER
I declare that the information given above is true and correct to the best of my knowledge and belief; that I have knowledge of the facts set forth herein; that the articles described in the notice of lading were received in the quantities were laden on the vessel named above for use on said vessel as supplies, except as noted below.

Received for use as bunkers, together with representative sample the quantities show above. Except quantities shown are subject to correction in case of error:

M.V. BIRCH 6

MASTER/CHIEF ENGINEER:

DATE:    Chief Engineer

White (office) Yellow (office) Pink (office) Green (ship)

# EXHIBIT 7

**From:** Tina Meilvang - tim [mailto:tim@plesner.com]
**Sent:** vendredi 21 novembre 2014 12:08
**To:** allash@for-group.ru; info@hc-chartering.de; info@hc-chartering.de; info@hc-chartering.de; alekseyk@marinefishingint.com; denisi@marinefishingint.com; operations@emschartering.de; ferhat@mavidenizcilik.com.tr; info@abpetrol.com.tr; bunkers@bebeka.nl; vamvanen@otenet.gr; info@sky-marine.com; amngr@nomikos.gr; jj@dan-bunkering.dk; BBN@dan-bunkering.dk; smpfueloslo@shell.com; operations@klaveness.com; info@jmb.dk; turkey@bwayachting.com; shipping@aalborg-portland.com; mail@aasenchar.com; operations@histria.ro; ulf.c.andersson@se.abb.com; tab@abcmaritime.ch; bunkers@bebeka.nl; OPS@ABLEGLORY.COM; CHARTERING@ABLEGLORY.COM; fe.flores@abojeb.com.ph; info@aboumerhi.com; akhouri@adnatcongsco.com; bunkers@aceoil.com.sg; ops@aceshipping.com; management@ace-tankers.com; bm@lt-shipping.com; operations.sgp@bwshipping.com; adrian.lai@bwshipping.com; info@sky-marine.com; bunkers@c-fuels.com; ops.bunkering@cldn.com; cabu@klaveness.com; jr@greenreefers.no; hull@oceanconnectmarine.com; operation@horizonships.com;

1

operations@caltrekfreight.com; taygun@ziyagoksel.com; eugene@cisnav.com;
dcalero@canaryfeeder.com; operations@canfornav.com; Timur.Rudnitskiy@Canpotex.com;
kemalkaradenizli@hotmail.com; info@begumyachting.com; irfananbar@akua-group.com;
info@dadaylilar.com; info@capellechartering.nl; bunkers@capitalship.gr; isa.luk@ssgil.com;
ops@ssgil.com; olga@bowlinelp.com; liushuling@carashipping.com.sg; info@sky-marine.com;
gaetan_perret@cargill.com; Manuel.Traeumer@Cargo-Levant.de; bunker@cargotrad.com.sg;
ops@caribetankers.us; chartering@carlbuettner.de; cfp@petership.de; turkey@bwayachting.com;
donotuse@carnival.com; eevans@carnival.com; turkey@bwayachting.com; ertan.celik@iss-shipping.com;
sales@cassarfuel.com; FreightInvoices@LDHEnergy.com; bilal@groupshipping.com; allash@for-group.ru;
allash@for-group.ru; bilal@grupshipping.com; transit@transit.com.tr; management@cemshipping.com;
Dalia.Abadir@cementia.lafarge.com; salvarezl@comibersa.masaveu.com; graham.osman@cemex.com;
michael@central-cis.com; m.laemmler@centralenergy.ch; xufeng@centrans-ccl.com;
bunkers@marinetrust.gr; bunker@cepsapanama.com; bunker@cepsa.com; pur@cerenshipping.com;
chartering@cerrahgil.com.tr; Stevenchan@cessnetsb.com; info@mantaship.com;
copemer@copemer.com; serdar.guner@armarin.com.tr; office@cfd.com.ua; daria.vlasova@cgg.com;
bunker@fugro.no; daria.vlasova@cggveritas.com; jlom@owbunker.com; daria.vlasova@CGG.com;
geneva@owbunker.com; mfikri@sbgs.com; champion@champion-tankers.no;
stefan.georgandis@chandris.com; fleet@changanship.com; changfeng@changfengshipping.com;
sherkhan@charterbulk.com; mail@chartworld.gr; yits@owbunker.gr; mail@chartworld.gr;
wwk@chellship.com; SGOPERATIONS@BLTCHEMBULK.COM; Joe.tierny@chemoil.com;
marketing@chemoil.com; rt.all@chemoil.com; kasper.soje@chemoil.com; chemoil@chemoil.mc;
tpe.tmchuang@cnc-line.com; opns@chengxinchart.com; cciray@singnet.com.sg;
DHMN@CHEVRON.COM; gmpuswcsal@chevron.com; Senora.Lakay@chevron.com; P.P@acrealton.com;
Andrew.Harwood@saga.co.uk; act@actmaritime.com; selcuk.uzun@nevmarine.com;
rrajeev@adamsoffshorewll.net; shipops@adani.com; upasana@adhartshipping.com;
danny.schulze@adm.com; Danny.Stutzbecher@adm.com; operation@nismar.net; azizg@egeports.com;
info@adorainvest.com; bobbyson.neo@sgp.pilship.com; info@sky-marine.com;
vgroussos@aegeancargo.gr; marinefuels@ampni.com; ara.bunkers@ampni.com;
opns.shipping@aegisbusiness.net; info@aenaon-shipping.com; rlove@eat-tankers.com; hjneo@aet-
tankers.com; hjneo@aet-tankers.com; kl@ecoship.net; info@africaexpressline.com; ams@amshipping.gr;
Tony.Power@aggregate.com; operations@AECarriers.com; operations@agroship.com;
christer.nilsson@ahlmarks.se; avillegas@carnival.com; Houston@owbunker.com; info@sky-marine.com;
christos@ajaxbunkering.com; al.khaleja@rakfzbc.ae; turkey@bwayachting.com;
turkey@bwayachting.com; morner.bangum@alam-swiber.com.my; operation@nismar.net;
himera.il@gmail.com; operations@albamar.gr; ebru@armadorshipping.com; sgiulio@shippy.it;
ops@alcyonshipping.com; Jean-Pierre.Laffaye@cetragpa.fr; cahituysal89@gmail.com; mail@alexgrieg.no;
info@sky-marine.com; kenneth.christensen@alfalaval.com; jari.talja@alfonshakans.fi; bunkers@fwc-
london.co.uk; donotuse@furnesswithy.com; mva@almar.lt; d.bryson@allleisuregroup.com;
aie@owbunker.com; operations@alliancemaritime.com; nuhamisah@sapurakencana.com;
C.Nomikos@allseas.gr; PvdD@allseas.com; operation@istshipping.com; ops@almitankers.gr;
chartering@alnak.com.tr; info@tunayachting.com; grace@bunkermaster.co.kr; info@sky-marine.com;
mail@alphabulkers.com; htyi@alphaoil.co.kr; cool-it@artship.de; ops@alphashipmanagement.de;
ops@alphashipmanagement.de; ops@alphaship.de; operations@alphatankers.com;
boccone@alphatrading.mc; bunkers@alphatrading.it; alpina@alpina.dk; turkey@bwayachting.com;
turkey@bwayachting.com; armatok@hotmail.com; mehmet@worldyachtingturkey.com; ops@amaggi.ch;
ops-de@essberger.biz; info@amalmar.gr; bunkers@bebeka.nl; cmd@amchkl.com;
lausanne@ameropa.com; sevket@atlantikdnz.com; cace@owbunker.cl; postfix@amnomikos.com;
greece@amoil.net; ops@amoysailing.com; kdesprez@amt.com.ch; hakan.aslan@aygaz.com.tr;
fernando.rebollo@anamar.es; bunkers@asgl.com; ops@ancora.gr; operations@andriaki.gr;
info@andrico.gr; murmanseld2@mail.ru; eve.godefroy@andromeda-shipping.com;
operations@andros.com; operations@noordriver.com; ho..bunkers@cma-cgm.com;
victoryang@franbo.com.tw; i.testov@anshp.ru; kemalkaradenizli@hotmail.com; info@sky-marine.com;
chartering@antaresshipping.ru; agiamar1@otenet.gr; operations@anthonyveder.com;
operations@anthonyveder.nl; turkey@bwayachting.com; chartering@anzmarine-energy.com;
solcal@apeejaygroup.com; VWendell@apexmar.com; sharda_devi@apl.com; info@sky-marine.com;
aquariusmaritime@singnet.com.sg; operations@aquavitainternational.com; turkey@bwayachting.com;
chartering@midwayshipping.com; info@arcadiasm.gr; arcadiashipping@vsnl.com; arcti-as@online.no;
info@aul.nl; ab@alliance-plus.ru; mcameron@ardmoreshipping.com; operation@aresshpg.com;

nihat.basaran@safishipping.com; canatay.yilmaz@safishipping.com; info@sky-marine.com; serhan@mtsaliaga.com; bunkering@argosenergies.com; operations@bayraktar.net; anil.agarwal@arinaoffshore.com; erdem.coker@arkasbunker.com; pil-konstantin@yandex.ru; ab@alliance-plus.ru; chartering@asl.ie; bunkers@bebeka.nl; nn.aung@bumiarmada.com; aprodand@fn.mde.es; info@sky-marine.com; armada@armada.com; serdar.guner@armarin.com.tr; shipinfo@aroania-maritime.com; bjorn@arrivashipping.no; info@artebunkering.ee; operation@armadorshipping.com; thomas@articgroup.no; arwadshipping@arwadshipping.com; operation@milenyumshipping.com; info@torlakshipping.com; info@sky-marine.com; gerry.xie@logistics-asl.com; davidk611@asiamarineservices.com; tifaliang@ampship.com; zamzuri@asiangeos.com; amc@asian-marine.com.tw; pdesawar@asiaticlloyd.com; management@cemshipping.com; management@cemshipping.com; shipman@ahileos.com; handy@barbulk.com; masao.kawakami@astomos.com; raivis@astramar.net; info@zoomyachting.com; eddie212100@gmail.com; info@astromaritima.com.br; towage@atasalvage.com; chalkidiv@atheniangroup.com; ulunay@kiran.com.tr; egill@sagaseafood.com; info@atlantic-aardolie.nl; ops@atlcb.com; buhmann.susanne@grimaldi.napoli.it; natasha.yamamura@cemex.com; interacco@co.uk; aylinkaramarine@gmail.com; saiju@amguae.net; csantangelo@atlanticmethanol.com; csantangelo@atlanticmethanol.com; je@atlantic-offshore.no; interacco@co.ru; kargopolov@cisnav.com; fletcher.wallace@atlantictowing.com; mva@almar.lt; buhmann.susanne@grimaldi.napoli.it; jonharvey@spainternational.co.uk; bunkers@actas.no; group@actas.no; operation@atlas-marine.gr; ops@atlasmaritime.eu; info@grecomar.com.gr; bunker.gc@gastaldi.it; op.atob@c-shipping.se; atob@c-shipping.se; turkey@bwayachting.com; info@sky-marine.com; ops-de@essberger.biz; mohsin@symphonyshipbd.com; sener@senerdenizcilik.com; info@sky-marine.com; info@sky-marine.com; bunkers@northseabunker.com; sdigrande@augustea.com; edmonty@auroratankers.com; commercial@austbulk.com; nick@ausbunk.com; JHarding@asiaworld.com.au; rederi@ksaetre.no; autopoduzece-imotski@st.t-com.hr; info@sky-marine.com; jack@avantoil.com; info@sky-marine.com; info@sky-marine.com; sanagnostopoulos@avin.gr; marinelubes@avinoil.gr; kemalkaradenizli@hotmail.com; turker@sonayshipping.com; kemalkaradenizli@hotmail.com; hakan.aslan@aygaz.com.tr; astatu@imamogullarishipping.com; azov-trans@kerch.com.ua; turkey@bwayachting.com; info@sky-marine.com; info@tunayachting.com; info@sky-marine.com; kemalkaradenizli@hotmail.com; tshimada@corepetrol.com; operations@bagadiya.com.sg; bebeka@bebeka.nl; bunkers@deme.be; abdul@bmco.biz; Waleed.Emeim@MSML.COM; Tkhan@bakrinavigation.com; globnav@te.net.ua; melnykov@balticatlant.eu; info@sky-marine.com; mehmet@worldyachtingturkey.com; bsc@balticshipping.dk; operation@navisiongroup.com; bunkers@baluco.com; info@sky-marine.com; byhean@msn.com; opsbhl@yahoo.com; hsin8686@yahoo.com; lorinchiam@yahoo.com; amy@ms1.stcl.com.tw; info@sky-marine.com; handy@barbulk.com; bariba@bariba.gr; info@sky-marine.com; barud@ath.forthnet.gr; dsenturk@tersanshipping.com.tr; kemalkaradenizli@hotmail.com; jd@mhf.de; operations@klaveness.com; operations@bayraktar.net; christoph.jansen@ufuels.com; bunkers@ufuels.com; bunkers@bebeka.nl; bebeka@bebeka.nl; info@sky-marine.com; bunker@navbul.com; mail@btb-bunkering.com; w.colaert@flamar.be; turkey@bwayachting.com; agency@belfreight.ru; leb@owicebunker.com; ab@alliance-plus.ru; info@sky-marine.com; singapore@btl-feeders.com; info@sky-marine.com; operation@bergebulk.com; atul.trehan@bergebulk.com; christopher.woodbridge@bergenbunkers.no; russia@owbunker.com; torstein@bergen-shipping.no; mgmt@bergshav.com; info@sky-marine.com; shipping@berner-alp.com; operation@besiktasgroup.com; chartering@beykozshipping.com; vessel@beykar.com; chartering@beykozshipping.com; guy.nichols@bg-group.com; office@bgp.com.sg; bhl_energy@yahoo.com.sg; byhean@msn.com; operations@bidsted.dk; bunker@bigportservice.com; bunkerdesk@spliethoff.com; info@sky-marine.com; info@sky-marine.com; bsp@blacksand.com.hk; info@bfi-spb.ru; mturan@incedeniz.com; ali@royalmar.com.tr; blossnet@otenet.gr; operations@densay.com; sia.ratajczak@heidmar.co.uk; info@sky-marine.com; info@sky-marine.com; info@sky-marine.com; bunker@blueoceaninternational.de; kievship@ukrtel.com; operation@armadorshipping.com; operations@blueseashipping.mc; bunkering@socomet-bunkering.com; info@sky-marine.com; info@sky-marine.com; Henri@hanseatic-bunker.com; bwsebj@bws.dk; bunker@evermarine.kr; lhn@bmsbunkers.com; info@bmt-bunker.de; emch@owbunker.com; gvaoffshore@owbunker.com; boberg@telia.com; operations@bocontishipping.be; chart@bocontishipping.be; bocs.bremen@bocs.de; ozgurozcelik69@gmail.com; metinonder@bodrumferryboat.com; anthony.durot@boeckmans.be; tunakurt@yahoo.com; ince@indeniz.com; serdar.guner@armarin.com.tr; filipe.sousa@bravante.com.br; bunkers@bomin.hk;

nrussmann@bomin.com; bunkers@bominflot.ee; BJVizena@Bominflot.co.uk; enquiries@bominflot.es; bonja@bonja.com.tr; bunkers@bebeka.nl; bunkers@bebeka.nl; cahituysal89@gmail.com; bjorn.hageselle@bourbon-online.com; purchasing@bourbon-offshore-greenmar.com; israel.monteiro@bourbon-online.com; shivendra.tripathi@bourbon-online.com; arnstein.lystad@bourbon-online.com; info@sky-marine.com; projects@bowship.com; victoria@bowlinelp.com; fueloiloperatorsrotterdam@bp.com; lase@owbunker.dk; hollowj@bp.com; baker.jones@bp.com; atle.holgersen@mokster.no; beny.junior@chouest.com; beny.junior@chouest.com; ops@brsml.com; peter.kijzerwaard@breadbox-shipping.com; kemalkaradenizli@hotmail.com; info@sky-marine.com; james@bridgewateraust.com.au; bunkers@ufuels.com; bunkers@ufuels.com; bright@bright.com.gr; jen@bmsunited.com; ronny.granath@brodin.se; brothers@brothersbunker.com; chartering@swedia.se; meba@owbunker.dk; copenhagen@owbunker.dk; info@amalmar.gr; post@bryggen.no; OPSFREIGHT; motbunker@maersk.com; hilde.svendsen@ostensjo.no; info@hanseatic-bunker.com; bss@bergenhus.no; purchasing@bul.com.cy; team@cometship.com; operation@bulkatlantic.com; operation@bulkatlantic.com; operations@bulkmarine.com; tba@tba.com; bunker.gc@gastaldi.it; info@hanoil.com; stanley.leng@bumiarmada.com; georgina.koh@bumiarmada.com; alfonsforneck@bwb.org; bna.ebusiness@bunge.com; gvabunkers@bunge.com; like@owbunker.com; bunkerholdings@transbunker.com; sales@bunkerhse.com.sg; bunkerkorea@kornet.net; edgar@bunkeroil.no; bjorn.tore@bunkeroil.no; trondf@bunkeroil.no; bunker@bunkerist.com; sales@bunkernet.com.cy; info@bunkersinternationaltr.com; info@bunkersjust.com; kemalkaradenizli@hotmail.com; chartering@beykozshipping.com; management@statusshipping.com; adrian.lai@bwlpg.com

**Subject:** Information letter to clients regarding payments [PLESNER-Active.FID1016736]


Please see that attached letter regarding payments.

Best regards,

_____          _____

TINA MEILVANG                                     PARTNER IN CHARGE
Secretary                                         Pernille Bigaard



TIM@PLESNER.COM

_____

Our ref. - MML/fwo
Doc no  1204198-1

Aalborg, 13 November 2014

**OW Bunker A/S, O.W. Bunker & Trading A/S, O.W. Supply & Trading A/S and O.W. Cargo Denmark A/S, all in bankruptcy**

On 7 November 2014 bankruptcy proceedings were initiated against OW Bunker A/S, Central Business Register Number 34900167, O.W. Bunker & Trading A/S, Central Business Register Number 66441717 and O.W. Supply & Trading A/S 17729071 by the Bankruptcy Division of Aalborg Court in Denmark.

On 10 November 2014 bankruptcy proceeding was initiated against O.W. Cargo Denmark A/S, Central Business Register Number 31 27 12 23, by the Bankruptcy Division of Aalborg Court in Denmark.

The undersigned, Attorney Pernille Bigaard and Attorney John Sommer Schmidt, has been appointed trustees by the court.

OW Bunker A/S, O.W. Bunker & Trading A/S, O.W. Supply & Trading A/S and O.W. Cargo Denmark A/S have been engaged as an independent contractor as charterer, owner etc.

The bookkeeping of OW Bunker A/S, O.W. Bunker & Trading A/S, O.W. Supply & Trading A/S or O.W. Cargo Denmark A/S indicate that there may be an outstanding balance in favour of O.W. Bunker A/S, O.W. Bunker & Trading A/S, O.W. Supply & Trading A/S or O.W. Cargo Denmark A/S pertaining to services provided by OW Bunker A/S, O.W. Bunker & Trading A/S, O.W. Supply & Trading A/S or O.W. Cargo Denmark A/S to you prior to the bankruptcy.

In this respect, we kindly ask you to note that all payments should continuously be made to the banking details stated in the respective invoices.

Silkeborgvej 2
8000 Aarhus C, Denmark

T +45 86 20 75 00
F +45 86 20 75 99

www.gorrissenfederspiel.com

VAT No.  DK 12 95 93 46

Page 2

**Please note that no other way of payment will be acceptable.**

We appreciate the inconvenience the bankruptcy of OW Bunker A/S, O.W. Bunker & Trading A/S, O.W. Supply & Trading A/S and O.W. Cargo Denmark A/S may cause you, however, we as trustees need to uphold the legal position of the bankruptcy estates stated above.

If you have any queries, please contact attorney Tina Kang by email, ow-bunker@plesner.com.

Kind regards

Pernille Bigaard and John Sommer Schmidt
Trustees